281 N.J. Super. 596 (1995)
658 A.2d 1330
GOODWILL HOME AND MISSIONS, INC., PLAINTIFF-APPELLANT,
v.
GARWOOD BOROUGH, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 1995.
Decided June 14, 1995.
*598 Before Judges BRODY, ARNOLD M. STEIN and PAUL G. LEVY.
Susan A. Feeney argued the cause for appellant (McCarter & English, attorneys; Frank E. Ferruggia, of counsel; Ms. Feeney on the brief and reply letter brief).
Robert F. Renaud argued the cause for respondent (Palumbo & Renaud, attorneys; Mr. Renaud on the brief).
The opinion of the court was delivered by ARNOLD M. STEIN, J.A.D.
The Borough of Garwood denied Goodwill Home and Missions, Inc. a real property exemption as a parsonage for the tax years 1991 and 1992. The property, a residence, was and is occupied by Reverend Lee Schmookler, its Executive Director/Pastor, and his family. The Union County Board of Taxation affirmed. The Tax Court affirmed the Board of Taxation. We reverse.
N.J.S.A. 54:4-3.6 provides exemption from real property taxation for "buildings, not exceeding two, actually occupied as a parsonage by the officiating clergyman of any religious corporation of this State ... which is devoted to the purposes above mentioned and to no other purpose...."[1]
*599 The Tax Court judge ruled that Schmookler was not "an officiating clergyman." She said: "[T]he Reverend is not an officiating clergyman and therefore it follows that the Garwood property was not occupied, during the tax years in question, as a `parsonage' and it is unnecessary to determine whether Taxpayer is a `religious corporation', as such term is used in the statute."
Although she specifically said that she was not deciding the question, we read her opinion to conclude that Goodwill was not a religious corporation.
[W]hile the members of Taxpayer (i.e. its Board of Directors) must be members of "an evangelical church" none of them attend any religious services at Taxpayer's Newark Mission properties, nor are they members of the Taxpayer's congregation.... It is more reasonable to assume that the Taxpayer's congregation comes to and remains at the Newark Mission properties to partake of necessary human survival services provided there, than to practice their multiple religions.
The judge also considered as significant Goodwill's "failure" to maintain a parsonage from the time of its founding in 1897 until 1981. "It appears that Taxpayer functioned from 1897 until 1981 (when the Plainfield residence was acquired) with no parsonage. The record does not contain any evidence of a shift in the Taxpayer's multiple purposes such as might explain the necessity of two parsonages."
The guaranties of the Free Exercise Clause of the federal constitution and the religious freedom clauses of our State constitution restrict inquiry into what is an organized religion, who is a member of its clergy and what constitutes a "congregation" of a religious body. U.S. Const. amend. I; N.J. Const. art. I, ¶¶ 3 and 4.
In Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33, rehearing denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1323 (1982), the United States Supreme Court said:
The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another....
....
This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause. Madison once noted that "Security for civil rights must be the same as that for religious rights. *600 It consists in the one case in the multiplicity of interests and in the other in the multiplicity of sects." ... Madison's vision  freedom for all religion being guaranteed by free competition between religions  naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference. Free exercise thus can be guaranteed only when legislators  and voters  are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations. As Justice Jackson noted in another context, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally." Railway Express Agency, Inc. v. New York, 336 U.S. 106, 112, 93 L.Ed. 533, 69 S.Ct. 463 (1949) (opinion concurring).
[456 U.S. at 244-46, 102 S.Ct. at 1683-84, 72 L.Ed.2d at 47-48.]
In Thomas v. Review Bd. of Ind. Empl. Sec. Div., 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), Justice Burger, writing for the majority, observed:
The determination of what is a "religious" belief or practice is more often than not a difficult and delicate task.... However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment Protection.
[450 U.S. at 714, 101 S.Ct. at 1430, 67 L.Ed.2d at 631.]
Goodwill's restated certificate, filed in 1971, sets forth its stated purposes
shall be to minister to the spiritual and material needs of men, women and children by conducting religious services, disseminating religious literature and materials, providing for the physical welfare of needy persons, operating an agency for the adoption of children and for foster care, salvaging used goods and repairing same for resale and use, and, in general, performing any other religious and charitable works not inconsistent with the provisions of this Certificate of Incorporation.
The bylaws list the objectives of the organization:
a. To minister to the spiritual and material needs of men, women and children and to "preach good tidings to the poor and to proclaim release to the captives, to set at liberty them that are bruised."
b. To conduct preaching services and Bible study classes, to conduct the Goodwill Bible Institute, to disseminate Christian literature and materials, to provide for the physical welfare of needy persons, to operate an agency for the adoption of children and for foster care, salvage used goods and repair same for resale and use and in general perform any other Christian and charitable work not inconsistent with the doctrinal statement of the Mission.
*601 The members of the corporation are the corporate directors, consisting of not less than ten nor more than twenty-one persons. Although the members-directors must "be born again members of an evangelical church[,]" they need not be of any particular Christian denomination. Each director-member is required to sign a statement of faith, consisting of several articles pledging a commitment to specific Christian principles.
Goodwill conducts its activities in three buildings in Newark. The main building is located at 79 University Avenue. The basement of this building houses the dining facility, kitchen, medical office and Bible classes. The first floor contains a 240-person capacity chapel and counselling and education room. The business offices are located on the second floor. The dormitory is located at 4244 Eagle Street, behind the main building. The third building, 75 University Avenue, houses a thrift store and warehouse.
Religious services are conducted at Goodwill seven days a week. Two organized chapel services are held each weekday, and one service on Saturday and one on Sunday. The services consist of hymns, preaching and testimonies of those who have received Jesus Christ. Representatives of "traditional" congregations conduct weekly night services, including Longhill Chapel, Highwood Park Baptist Church, First Baptist Church of Bloomfield, First Presbyterian Church of West Orange and First Presbyterian Church of Hillside. Bible studies are also conducted four times a day. Counselling services, religious in nature, are also provided.
Goodwill's other activities include the operation of a drop-in center, providing meals and lodging for the needy and homeless; the collection, repair and sale of used clothing, furniture and household items at its thrift store; donations of clothing, furniture and household items to needy clients referred by various agencies and institutions; and providing tuberculosis testing facilities for Newark Homeless Health Care and St. Michael's Hospital.
Goodwill's population is primarily transient. Approximately 200 people per day are housed and fed at its Newark mission. The *602 non-transient population consists of three subgroups: the Goodwill Home; the discipleship program; and the resident assistance program. The Goodwill Home consists of eleven men who, because of physical or emotional problems, will probably remain at the Newark mission properties for the rest of their lives. These residents occupy dormitories, eat in the cafeteria and take part in various spiritual programs. The discipleship program, nine months long, has about sixty members. The program is designed to assist men with certain problems such as gambling and substance addiction. These members are provided with food, shelter, counselling and spiritual programs. The resident assistance program consists of approximately five men who have completed the discipleship program and desire further training to eventually find work in a rescue mission setting.
Over forty years ago we defined "congregation" as "an assemblage or union of persons in society to worship their God publicly in such manner as they deem most acceptable to Him, at some stated place and at regular intervals." St. Matthew's Lutheran Church for the Deaf v. Div. of Tax Appeals, 18 N.J. Super. 552, 558, 87 A.2d 732 (App.Div. 1952).
An institution that conducts religious services several times a week in one location and trains people in its religious tenets as followers of Jesus Christ must be considered a religious congregation, i.e., "an assemblage ... of persons ... to worship their God publicly in such manner as they deem most acceptable to Him, at some stated place and at regular intervals." Id. Goodwill qualifies as a religious congregation. There are public religious services conducted at a fixed place at regular intervals. Goodwill's status as such a congregation is not foreclosed by its massive commitment to the assistance of the poor and other needy individuals. That is a praiseworthy form of religious expression accepted by congregations of all denominations.
Nor is Goodwill disqualified as a religious congregation because its pastor and director-members are of various religious denominations, as are those who attend services, many of whom *603 probably have no present religious affiliation and some of which may be struggling with their religious beliefs. In St. Matthew's, we upheld parsonage status where the resident, an ordained Lutheran minister, led a congregation which met regularly in a borrowed Lutheran church. Id. at 555, 87 A.2d 732. That congregation was formed "to serve the religious and spiritual needs of the deaf in New Jersey." Id. at 554, 87 A.2d 732. Its only qualification for a member was that he or she was hearing-impaired. Ibid. We held that a congregation need not be associated with a particular national religious corporation in order to have a parsonage. Id. at 555, 87 A.2d 732. We read St. Matthew's to permit parsonage status to property owned by a non-denominational congregation. Finally, it is not the proper function of a tax assessor or a court to explore or speculate about the motives of people who attend religious services.
Reverend Schmookler was ordained as a minister in 1984. He was appointed as Goodwill's executive director in March 1989. His duties were then largely administrative. In May 1990, when Reverend Schmookler assumed his official duties as pastor, he became responsible for Goodwill's religious services and activities. Reverend Schmookler personally leads at least one service per week. He is responsible for the content and supervision of Bible study classes, taking part in these classes on an "as-needed" basis. He further testified about his duties:
I guess basically what happened was I took on the direct supervisory responsibility of pastor rather than having somebody between me who was kind of helping me with it. I took on the direct responsibility of  of supervising, seeing that the chapel services were conducted and that all of those ministries that were conducted were conducted in a way that was pleasing to God and  and in  and in compliance with our articles of incorporation and by-laws. I wound up doing alot [sic] more counselling, too, with individuals[.]
....
I took on the  I took on the responsibility for a  for a morning  for a morning prayer and devotional service for the men and  and  and as I stated I became the direct link and much more closely associated with the chapel groups that were coming in at night and I became their liaison person rather than somebody else when somebody  if somebody  if we had an open night and somebody wanted to come and do a chapel service I would have been the one that would have been  *604 that  that would have interviewed them and explained what we did and made the direct decision as to whether or not they were qualified to do it  to  to  to lead a service at the mission, those kinds of things.
These duties sound like those performed by congregational leaders of all religious denominations. A congregation has the right to determine how its minister performs his or her religious duties. "[T]he municipality cannot question [such a] determination." Trenton Church of Christ v. City of Trenton, 3 N.J. Tax 267, 271 (Tax 1981) (citing U.S. Const. amend. I). Governmental inquiry into how a minister allocates the performance of his or her religious duties is an improper incursion into the activities of a religious organization, an intrusion uncalled for by the statute and proscribed by constitutional protection.
Nor is it government's concern where Reverend Schmookler and his family attend religious services. The statute does not require that a minister and/or his family attend services at the place of worship where he or she is a spiritual leader.
The cases relied upon by the Borough of Garwood are not on point. See Shrine of Our Lady of Fatima v. Mantua Tp., 12 N.J. Tax 392, 398 (Tax 1992) (property occupied by church deacon not a parsonage because property "regularly and continuously utilized" as a base for occupant's window treatment business); Trenton Church of Christ, supra, 3 N.J. Tax at 275 (parsonage status denied where none of occupants were officiating clergyman, i.e., "an elder of the church or an officiating director or a pulpit minister"); Borough of Cresskill v. Northern Valley Evangelical Free Church, 125 N.J. Super. 585, 586, 312 A.2d 641 (App.Div. 1973) (parsonage status denied where principal occupant was youth director of a church who was not an ordained minister, therefore not an officiating clergyman); International Missions, Inc. v. Borough of Lincoln Park, 87 N.J. Super. 170, 174-75, 208 A.2d 431 (App.Div. 1965) (occupant not an officiating clergyman because he had no established congregation, but preached at various churches by invitation).
*605 The judgment is reversed and the matter is remanded to the Tax Court for entry of judgment affording plaintiff a parsonage exemption for the years 1991 and 1992.
NOTES
[1] Goodwill has a second parsonage in Plainfield, occupied by an assistant pastor. In City of Plainfield v. Goodwill Home & Missions, Inc., 4 N.J. Tax 537 (Tax 1982), the Tax Court held that Goodwill was entitled to a parsonage exemption for its residence in Plainfield occupied by an assistant pastor, even though the property was located in a different taxing district from Goodwill's main place of operation. Id. at 540. That case is of no assistance to us in resolving this appeal. Plainfield conceded that except for the location of its residence in a different municipality, the property fully qualified for parsonage status. Id. at 538.