SMALL, J.T.C.
These six matters involve challenges to tax assessments against the former parish properties of Our Lady of the Most Blessed Sacrament and Our Lady of All Souls for the tax years 1994,1995, and 1996. Plaintiff seeks exemptions pursuant to N.J.S.A. 54:4-3.6 for properties actually and exclusively used for religious worship or religious purposes.
The plaintiff, Roman Catholic Archdiocese of Newark (“Archdiocese”), is a religious corporation formed pursuant to N J.S.A, 16:15-9 to -17. The Archdiocese is part of the Roman Catholic *301 Church and operates through its constituent parishes. Two of the Archdiocese’s parishes, Our Lady of the Most Blessed Sacrament and Our Lady of All Souls, were active churches providing religious support and education to their congregations for decades. In July 1993, these two parishes were dissolved under New Jersey law and suppressed under the Church’s canon law by the Archdiocese due to the deterioration of the facilities and declining attendance. As a result, the parishes no longer exist under civil law, the Archdiocese has succeeded to the assets and liabilities of the parishes under canon law, and under civil law, the Archdiocese now owns these former parish properties.
Our Lady of the Most Blessed Sacrament used the property at Block 430, Lot 26 and Block 430.01, Lot 17 on the tax map of the City of East Orange. After July 1993, and as of the October 1, 1993 assessment date for the 1994 tax year, the parish properties were used exclusively by the Archdiocese, providing daily Mass and acting as a repository for church records and artifacts, and housing the retired pastor of the former parish. After July 1994, the Archdiocese offered only weekly Mass, and the retired pastor left the rectory. As of the October 1, 1994 and October 1, 1995 assessment dates, in addition to the weekly Mass, a Catholic youth basketball team occasionally used the parish’s gymnasium for practice and team meetings.
Our Lady of All Souls used the property at Block 151, Lots 1.01, 3, and 49 on the tax map of the City of East Orange. As of the October 1,1993 assessment date, the parish property was used by both the Archdiocese and the East Orange Board of Education. The Archdiocese offered weekly Mass, and held deanery meetings in the church rectory. Additionally, religious artifacts and furnishings were stored for safekeeping. The East Orange Board of Education rented space for classes on what is now Lot 2, and eventually acquired the lot following a subdivision in December 1994. The Archdiocese maintained the same activities at the parish property on the October 1, 1994 and October 1, 1995 assessment dates.
*302 The weekly Masses at both former parish properties raise the most difficult aspect in these matters. Testimony at trial and security log books maintained at each church clearly show that, usually, no more than two persons were present at each Mass: the pastor and the security guard for the church. The log books indicate that, occasionally, others did attend, but those days were few and far between. Although the doors to the churches were unlocked on the days Masses were said, no one could have known about the Masses unless they asked the pastors, or happened by the churches, since there was otherwise no advance notice to the public. Although it is clear that regular Mass was celebrated at each former parish, why individuals celebrating the Mass chose to do so at those times and places is not so clear. The log books kept as a record of those Masses contain virtually no entries other than the weekly “Mass celebrated by Fr.__Two in attendance.” They confirm the testimony that Masses were conducted.
The defendant municipality argues that the court must examine the quantum of use of the parish properties to determine whether they qualify for tax exemptions under N.J.S.A. 54:4-3.6, and contends that the properties here were insufficiently used for religious worship or religious purposes by the Archdiocese to permit such exemptions. The Archdiocese asserts that such an examination by the court would amount to an impermissible intrusion into the religious activities of the Roman Catholic Church, and thus would violate the Church’s First Amendment protections under the United States Constitution and similar protections under the New Jersey Constitution. N.J. Const., art. I H1Í 3 and 4.
I.
Inquiry Into Religious Use
In determining whether a religious organization is entitled to a tax exemption for its property, the courts in New Jersey have always inquired into the activities of the organization and its purposes. See, e.g., Grace & Peace Fellowship Church, Inc. v. *303 Cranford Tp., 4 N.J. Tax 391 (Tax 1982) and Trenton Church of Christ v. City of Trenton, 3 N.J. Tax 267 (Tax 1981) (discussing the different prayer services and other program activities of a church in evaluating whether religious purposes were actual and exclusive). Such an inquiry is mandated by N.J.S.A 54:4-3.6, which requires both actual and exclusive use as a condition to obtaining a tax exemption. The federal courts have also approved of such inquiries of religious entities. See, e.g., United States v. C.E. Hobbs Found, for Religious Training and Educ., Inc., 7 F.3d 169 (9th Cir.1993) (requiring a church to demonstrate a burden on the tree exercise of religious beliefs due to an IRS inquiry to establish a First Amendment violation); United States v. Coates, 692 F.2d 629 (9th Cir.1982) (holding that IRS examination of corporate minute books of a church to determine whether it qualified for tax exemption was not unconstitutional interference with religious affairs of the church under the First Amendment).
The issues to be addressed in determining whether the two former parish properties are entitled to tax exemption are: (1) may a court inquire into the nature of religious use of otherwise qualified property; (2) once any religious use is established, does the religious organization need to establish a certain level, amount, or quantum of use to qualify for the exemption; (3) is the storage of religious artifacts and other church property a religious use; and (4) does the leasing of property to the East Orange Board of Education void a tax exemption to which the property is otherwise entitled because it is “actually and exclusively used in the work of [an] association[ ] and corporation! ] organized exclusively for religious. . .purposes.”
II.
Quantum of Use
N.J.S.A. 54:4-3.6 provides:
The following property shall be exempt from taxation under this chapter ... all buildings actually and exclusively used for ... religious worship ... all buildings actually and exclusively used in the work of associations or corporations organized exclusively for religious ... purposes ... the land whereon any of the buildings *304 hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed five acres in extent____The foregoing exemption shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and is authorized to carry out the purposes on account of which the exemption is claimed____
Our Supreme Court has summarized the elements of an exemption under this statute using three criteria: (1) the corporation must be organized exclusively for the exempt purpose; (2) the property must be actually and exclusively used for the exempt purpose; and (3) the corporation must not operate or use its property for profit. Paper Mill Playhouse v. Millburn Tp., 95 N.J. 503, 506, 472 A.2d 517 (1984).
The City does not challenge the Archdiocese’s qualifications as a religious corporation that is organized exclusively for religious purposes, nor does the City assert that the Archdiocese operates the subject properties in a for profit manner. There is no dispute with respect to the statute’s requirement limiting the amount of land (five acres) that may enjoy exemption with respect to a given improvement. Thus, the only issue for this court to resolve is whether the properties were actually and exclusively used for religious worship or religious purposes.
The First Amendment to the U.S. Constitution generally provides for protections of religious freedom. U.S. Const, amend I. However, such protections are not absolute, and burdens, including tax burdens are permitted. See, e.g., United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (holding that imposition of social security taxes on persons who object to the receipt or payment of public insurance benefits on religious grounds does not violate the First Amendment); South Ridge Baptist Church v. Indus. Comm’n of Ohio, 911 F.2d 1203 (6th Cir.1990), cert. denied, 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991) (holding that requiring church to make contributions to workers’ compensation fund opposed by such church did not violate First Amendment); Indian Hills Community Church v. County Bd. of Equalization, 226 Neb. 510, 412 N.W. 2d 459 (1987) (holding that First Amendment does not prohibit state require *305 ment that religious organization comply with state’s reasonable procedures for obtaining property tax exemption); Welch Ave. Freewill Baptist Church v. Kinney, 10 Ohio App.3d 196, 461 N.E.2d 19 (1983) (holding that denial of tax exemption for vacant lot held by church for no current purpose or any future exempt purpose did not violate First Amendment); In re Open Door Baptist Church, 63 Pa.Cmwlth. 292, 437 A.2d 1291 (1981) (holding that denial of tax exemption for part of church property that was not necessary for occupancy and enjoyment of church did not violate First Amendment).
The New Jersey Constitution of 1947 also provides broad protections of religious freedom. N.J. Const, art. I, ¶¶3 and 4. Such protections extend to exemptions from taxation on real and personal property used exclusively for religious purposes. Id. at art. VIII, § 1, H 2. The exemption from taxation provided for religious organizations by the New Jersey Constitution is not absolute. See, e.g., New Life Gospel Church v. State, 257 N.J.Super. 241, 608 A.2d 397 (App.Div.), certif. denied, 133 N.J. 429, 627 A.2d 1136 (1992) (holding that imposition of government fees did not violate exempt status of religious organization); Bethany Baptist Church v. Deptford Tp., 225 N.J.Super. 355, 542 A.2d 505 (App.Div.1988) (holding that property used for nonexempt purposes on assessment date and later acquired by exempt church is nevertheless subject to taxation for the succeeding year without violating federal or state constitutions); New Jersey Stake of Church of Jesus Christ of Latter Day Saints v. Morris Tp., 3 N.J. Tax 572 (Tax 1981) (holding that the five-acre limitation on exemption for church property did not violate church’s constitutional protections of religious freedom where zoning ordinance required lot size in excess of five acres which resulted in partial taxation of church property).
New Jersey courts have never addressed the issue of whether a minimum level of activity is required to obtain a tax exemption for property used for religious worship or religious purposes. The courts have found that complete non-use of property by a tax exempt religious entity will not suffice to obtain a property tax *306 exemption, even if future exempt use is contemplated or anticipad ed, Holy Cross Precious Zion Glorious Church of God v. City of Trenton, 2 N.J. Tax 352 (Tax 1981); Rector, Wardens and Vestrymen of Christ Church v. Millburn Tp., 26 N.J. Misc. 123, 57 A.2d 506 (Div. Tax App.1948), and that incidental uses of the property during construction were not sufficient to qualify a property for exemption when the principal religious activities of the congregation were conducted elsewhere. Grace & Peace Fellowship Church, supra, 4 N.J. Tax 391.
Courts in other jurisdictions, however, have grappled with the issue of to what extent religious use of property is required in order to obtain a tax exemption.
In Michigan, the state court of appeals adopted a “quantum of use” test in Lake Louise Christian Community v. Hudson Tp., 10 Mich.App. 573, 159 N.W.2d 849 (1968). In that case, the court rejected a charitable exemption for a religious organization that utilized a summer camp for its members. The court developed the quantum of use test with two criteria: (1) the use must be incidental or related to the organization’s express purpose; and (2) the property must be used frequently for that purpose. Id. 159 N.W.2A at 854. The court found that the part of the camp designated for hiking was too infrequently used “in any appreciable quantum” to obtain the exemption. The court noted the lack of defined hiking trails or other evidence of constant use, and the testimony of one witness who found a small campfire big enough for a lone fisherman. The court’s research of prior exemption cases found that the exemption was granted where there was frequent use of the property, and thus such use was one prerequisite to an exemption.
The Lake Louise decision has been heavily criticized in later rulings of the Michigan Court of Appeals. In National Music Camp v. Green Lake Tp., 76 Mich.App. 608, 257 N.W.2d 188 (1977), the court reversed the tax tribunal’s application of the quantum of use test to an educational facility that owned unimproved, unspoiled dunes on Lake Michigan for limited recreational use. The court of appeals, which described the quantum of use *307 test as “stringent,” “extreme,” and “rigorous,” id. 257 N.W.2d at 189, found that “[t]he property was used in a manner consistent with the nature of the land in such a way that the purpose for which the owning institution is exempt, education, was plainly advanced.” Id. at 190. As a result, the court rejected the application of the quantum of use test to education exemptions. In Institute in Basic Life Principles, Inc. v. Watersmeet Tp., 217 Mich.App. 7, 551 N.W.2d 199 (1996), the court of appeals explicitly followed National Music Camp and rejected the application of the quantum of use test to religious exemptions. The court stated:
Although the cases rejecting the quantum of use test involve educational institutions rather than houses of public worship, their reasoning applies here. We decline to invite the Tax Tribunal to apply the rigorous quantum of use test, finding that the test would unnecessarily intrude into the affairs of religious organizations. Rather we adopt the criteria employed in Natl Music Camp ... and ask whether the entire property was used in a manner consistent with the purposes of the owning institution. This test avoids undue entanglement in the province of religious entities, and more closely conforms with the requirement under the exemption statute that the property be used predominantly for teaching the religious truths of the society.
[Id. 551 N.W.2d at 205 (citation omitted).]
In Colorado, the Supreme Court rejected a lower court’s ruling that found an insufficient benefit to the people of the state from an exemption to a religious organization. In General Conference of the Church of God — 7th Day v. Carper, 192 Colo. 178, 557 P.2d 832 (1976), the court held that there was no requirement that a religious organization demonstrate any social benefit to the state as a condition for the exemption. Further, the court found that the size of the religious organization was irrelevant to the entitlement to a religious exemption. In rejecting any consideration of the size of the organization in whole number or as a percentage, the court stated that “[njumbers alone can never serve to evaluate the substance or essence of a religions faith.” Id. 557 P.2d at 834.
In New York, the Supreme Court held that the use of a building in part for storage would not cause it to lose its tax exemption. “Constant daily use is not contemplated or compelled.” Congregation Emanu-el of New York v. City of New York, 150 Misc. 657, 270 N.Y.S. 6, 9 (N.Y.Sup.Ct.1934). Another New York court has *308 held that an entire YWCA facility would still- be entitled to a tax exemption even though part of the facility was closed.
A pertinent analogy may be instructive on this point. What the respondent proposes is analogous to holding that a church which loses parishioners due to cynical times should lose its exemption pro rata according to the number of empty pews. Even should the church, as a matter of convenience, close off the back pews, no municipality would be permitted to tax the church property pro rata.
[YWCA of Rochester v. Wagner, 96 Misc.2d 361, 409 N.Y.S.2d 167, 173 (N.Y.Sup. Ct.1978).]
In Utah, the Supreme Court rejected a “de minimis” test for a religious exemption. In Corporation of the Episcopal Church in Utah v. Utah State Tax Comm’n, 919 P.2d 556 (Utah 1996), the court addressed the use of unimproved church property held for future construction of a worship facility. The property was coneededly used for about two hours per year, in 1990 for a Thanksgiving service, in 1991 for parish vestry meetings, and in 1992 for a ceremonial ground-breaking service and a service in observance of the Feast Day of St. Francis of Assisi. The tax commission found that the “property’s use for religious purposes was ‘de minimis and insufficient to qualify the property for exemption from property tax.’ ” Id. at 557-58. The Supreme Court rejected the commission’s approach:
The difficulty of the Commission’s approach is that it simply uses a subjectively applied label as the basis for its legal conclusion. If two hours out of the year is insufficient to establish exclusive use, what then about two days or two months? Neither we nor the Commission can articulate with any clarity what constitutes de minimis usage as it relates to exclusive use. Nor does the Constitution support any such standard.
[Id. at 559.]
The court nevertheless denied the church’s exemption because the primary purpose of the holding of the property was for future development and not exempt activity.
The single exception to the uniform rejection of a quantum of use test came from a closely divided (3-2) Vermont Supreme Court with respect to an educational exemption. In Governor Clinton Council, Inc. v. Koslowski, 137 Vt. 240, 403 A.2d 689 (1979), the court rejected an educational exemption for a boy scouts organization that used a summer camp about once a summer to observe flora and fauna. The court noted that “the *309 right to hold land without being subject to taxation may constitute a substantial detriment to the affected locality and a significant advantage to the landowner. We construe ‘use’ to reach such holding. Such use ought not to result in exemption from taxation absent the conferral of a substantial public benefit such as the tax exemption law was designed to foster.” Id. 403 A.2d at 695. This holding does not appear ever to have been applied to religious organizations.
The above cases suggest, at a minimum, that, while an examination of the quantum of activity may be appropriate in some circumstances, the courts of these jurisdictions will not apply such a test to religious organizations. The courts steer clear of any First Amendment conflicts that might arise from restrictive interpretations of tax exemption statutes as they pertain to religious organizations, and instead offer flexible and reasonable interpretations that minimize the burden on religious organizations to obtain exemptions for religious use of their property.
Although New Jersey courts have never addressed this issue with respect to the exemption for religious worship or religious purposes, they have addressed the issue, indirectly, with respect to the parsonage exemption. In St. Matthew’s Lutheran Church for the Deaf v. Division of Tax Appeals, 18 N.J.Super. 552, 87 A.2d 732 (App.Div.1952), the taxpayer-church challenged the denial of the exemption for the parsonage in which its minister lived. The taxpayer did not own any church property, but shared use of a church facility in Newark owned by another religious organization. However, the taxpayer did have an established congregation that met every Sunday afternoon at the Newark facility. The minister was specially appointed by the national Lutheran Church to provide services for the hearing-impaired, and served in a similar capacity for other Lutheran congregations around New Jersey which also shared the use of church facilities with other religious organizations. The Division of Tax Appeals denied the parsonage exemption claiming that a parsonage was not a religious institution unless it was associated with church exempt property. The Appellate Division reversed, determining that a *310 parsonage was exempt if its minister was the officiating clergyman over a local congregation, as opposed to an “itinerant evangelist” who traveled the country but who did not have any fixed or settled congregation locally. The court found that “a congregation signifies an assemblage or union of persons in society to worship their God publicly in such manner as they deem most acceptable to Him, at some stated place and at regular intervals.” Id. at 558, 87 A.2d 732 (emphasis added). This language suggests a requirement that the minister be engaged in a regular pattern of activity through a fixed congregation, although the court left unclear what constituted a congregation for purposes of the parsonage exemption.
In Goodwill Home and Missions, Inc. v. Garwood Bor., 281 N.J.Super. 596, 658 A.2d 1330 (App.Div.), appeal dismissed, 143 N.J. 317, 670 A.2d 1059 (1995), the Appellate Division attempted to determine what constituted a religious congregation for purposes of the parsonage exemption that was left unanswered by St. Matthew’s. The taxpayer organization conducted religious services seven days a week, and offered meals, lodging and other services to the needy and homeless. Although the taxpayer’s population of 200 was mostly transient and came to the mission to be housed and fed, the court found that the organization had a non-transient population of about 70 persons who either resided at the mission or who regularly attended meetings at the mission— all of whom received spiritual counseling and other services to combat various addictions or other social problems. The Appellate Division concluded that the counseling was part of the training of people in the religious tenets of the organization, and thus was a religious congregation due to its fixed meeting place and its activities at regular intervals, id. at 602, 658 A.2d 1330, and thus entitled to the parsonage exemption. The court did not explain the significance, if any, of the size of the congregation other than to emphasize their regular presence at the religious services.
The Tax Court, in denying the parsonage exemption in Shrine of Our Lady of Fatima v. Mantua Tp., 12 N.J. Tax 392 (Tax 1992), found that religious services were conducted only two days *311 per month, and that the parsonage property was used for the personal convenience of the church’s deacon. As for the services, the deacon testified that he tried to conduct Mass daily for himself and his family, and twice per month for the other members of the congregation, which consisted of about twenty members, although only eight to ten attended Mass. The court ignored the services held for the deacon and his family in finding that services were held “occasionally” twice per month, id. at 397, which was one factor in denying the exemption. This decision suggests that a religious congregation requires more than merely the pastor and his family, although the court did not assign any weight to the size of the congregation beyond the pastor and his family.
Of course, the parsonage exemption involves different issues and different standards than the exemption for religious worship and religious purposes, and no courts in this state have ever suggested that the quantum, regularity, or consistency of religious activity are necessary prerequisites to the latter exemptions. Even in the context of the parsonage exemption, the New Jersey courts have refused to establish de minimis requirements for the activity of the religious entity or its members other than an undefined regularity test. The courts in other jurisdictions have also avoided the pitfalls of such requirements that would require over-intrusive examinations of religious entities. The four states that have considered the applications of such restrictive tests to religious entities (Michigan, Colorado, New York, and Utah) have all rejected them, with only Michigan considering whether the activities on the property are consistent with the purposes of the church (a fairly minimal consideration which appears not to be interpreted very strictly).
N.J.S.A. 54:4-3.6 only requires actual and exclusive use, and does not impose a de minimis test on entitlement to religious worship or religious purposes exemptions. See contra N.J.S.A. 54:4-23.5 (requiring minimum gross sales of $500 per year as condition to farmland assessment). This is consistent with the favorable treatment of religious institutions in New Jersey which are protected by three separate provisions of the New Jersey *312 Constitution, one of which specifically requires the granting of exemptions from taxation for property used exclusively for religious purposes. N.J. Const, art. I, K 3 (religious freedom) and 114 (no religious establishment); N.J. Const, art. VIII, § 1, H 2 (religious purposes tax exemption).
Grace & Peace Fellowship Church, supra, found that incidental use of a church while under construction, but prior to formal occupancy, would not qualify a church for exemption. In carefully reviewing the cases of idle and uncompleted buildings, Judge Andrew found that, until the building is completed and fully occupied, it may not benefit from the exemption granted by N.J.S.A 54:4-3.6. 4 N.J. Tax at 397-98. Similarly, when a building has been destroyed by fire, it may lose its exemption. YWCA v. Monmouth Tax Bd., 92 N.J.L 330, 105 A. 726 (Sup.Ct. 1919), discussed at Grace & Peace, supra, 4 N.J. Tax at 399.
The law is well settled that in return for a tax exemption, the property owner seeking the exemption must provide some quid pro quo.
Exemption [from taxation] can be justly sustained only upon the principle that the ‘concession is due as quid pro quo for the performance of a service essentially public, and which the state thereby is relieved pro tanto from the necessity of performing____’
[Kimberley School v. Montclair, 137 N.J.L. 402, 404-5, 60 A.2d 313 (1948) ]
To measure the quantum of religious use of a completed building as a condition of granting a tax exemption would engage the courts in an improper evaluation of religious practice. Obviously, minimal use creates a heavy burden on a municipality. The quid pro quo is hardly there. But once occupied and used (so long as there are no prohibited uses and there are some appropriately exempt uses), the failure to grant exemptions would be inappropriate. The court recognizes that the consequences of refusing to inquire into the quantum of religious use may tempt others to abuse the statute and gain tax exemption without any quid pro quo. That is not the case which is before this court. The fact that the amount of service performed for the community at the two properties which are the subject of this appeal had been *313 significantly greater than the services currently performed, is not a reason to deny them their exemption.
Religious institutions are entitled to the exemption under NJ.S.A. 54:4-3.6 if they demonstrate that the property is actually used for a religious purpose, and that the amount of use in this case, though minimal, is sufficient to sustain the exemption. Once it has been proven that religious activities are conducted on the property, the taxpayer has met its prima facie case on that issue, and then must prove only that such exempt use is exclusive to establish entitlement to the exemption.
The Archdiocese actually used the two former parish properties in East Orange for religious worship and religious purposes. At Our Lady of the Most Blessed Sacrament and Our Lady of All Souls properties, Mass was held weekly during the three tax years in dispute, and on occasion, deanery meetings and Catholic youth basketball practice also took place. Both parish properties were also used for the storage of religious artifacts and documents. The fact that the Masses were attended by only two persons on most occasions is irrelevant, as is any inquiry into the reasons why the participants selected the time and place for those religious observances. See Goodwill Home and Missions, supra, 281 N.J.Super., at 603, 658 A.2d 1330 (stating that “it is not the proper function of a tax assessor or a court to explore or speculate about the motives of people who attend religious services.”). The Mass services are obviously part of the spiritual practice of the Roman Catholic Church, and there is no claim otherwise by the defendant municipality.
III.
Warehouse Use
Although actual use of the former parish properties has been established, the Archdiocese must also prove that the properties were exclusively used for exempt purposes. In this regard, the use of the properties as a warehouse for church documents and religious artifacts is raised as an issue.
*314 This issue has never been specifically addressed, but one New Jersey court has alluded to it. In City of East Orange v. Church of Our Lady of the Most Blessed Sacrament, 25 N.J. Misc. 58, 50 A.2d 390 (Div. Tax App.1946), which involved one of the two properties which is the subject of this litigation, the Division of Tax Appeals affirmed the county board’s granting of a religious purposes exemption under N.J.S.A 54:4-3.6. The Division noted, in describing the church property, that one of the second floor rooms was used as a storage place for church and school records, and that one of the rooms on the third floor was used as a storage place for church property. The Division, after reviewing the testimony and evidence, concluded that the church property “was actually and exclusively used for religious purposes.” Id. at 60, 50 A.2d 390 (emphasis added). Other New Jersey cases have granted exemptions where storage space was allocated on the property. See Town of Morristown v. Woman’s Club of Morristown, 124 N.J. 605, 592 A.2d 216 (1991) (granting historic site exemption). Other jurisdictions have also granted exemptions to religious entities where part of the property was used for storage. See, e.g., City of Nome v. Catholic Bishop of Northern Alaska, 707 P.2d 870, 894 (Alaska 1985) (treating storage space as support property for the church). See also Congregation Emanu-el v. New York, supra.
The East Orange v. Church of Our Lady of the Most Blessed Sacrament decision is consistent with eases such as Dawn Bible Students Ass’n v. East Rutherford Bor., 3 N.J.Super. 71, 65 A.2d 532 (App.Div.1949), where the Appellate Division affirmed a religious purposes exemption for property used for the operation of printing presses. The court found that such an exemption was appropriate because the output of the presses was entirely of a religious nature. Similarly, in storage eases involving religious entities, so long as the documents and artifacts warehoused at the church facilities are of a religious nature or relate to the operation of the church, such use should be deemed a religious purpose and consistent with the exemption under N.J.S.A 54:4-3.6.
*315 In the within matter, there is no dispute that the documents and artifacts maintained by the Archdiocese related either to the churches or were of a religious nature. Thus, such storage space is consistent with the religious purposes exemption, and will not poison the exemption for the remainder of the property. The deanery meetings and Catholic youth basketball practices are also consistent with the overall exempt purpose of the churches.
IV.
Lease to the East Orange Board of Education
Finally, I turn to that portion of the Our Lady of All Souls property leased to the East Orange Board of Education in 1993 and 1994. In the literal language of N.J.S.A 54:4-3.6, it was not “actually and exclusively used in the work of [an] association ] and corporation ] organized exclusively for religious or charitable purposes.” NJSA 54:4-3.6 (emphasis added). Under N.J.S.A 54:4-3.6, there are two models for exemption. Certain property, namely, that property exempt by virtue of its ownership and use for educational, hospital, and moral and mental improvement purposes, may be partially exempt from taxation if a portion of that property is used by a nonexempt entity for a nonexempt purpose. See, e.g., Jersey Shore Medical Ctr. v. Neptune Tp., 14 N.J. Tax 49 (Tax 1994). Other property, if not exclusively used for its exempt purpose, loses its entire exemption. This court has held that the leasing of an exempt educational property by an exempt educational organization to another exempt educational organization for an educational use will not defeat the claim of exemption. West Orange Tp. v. Joseph Kushner Hebrew Academy, 13 N.J. Tax 48 (Tax 1993). However, the authority for that determination does not compel a finding that a lease by a religious organization to an educational organization qualifies for continued exemption. Id. at 52-53; see also Boys’ Club of Clifton, Inc. v. Jefferson Tp., 72 N.J. 389, 400, 371 A.2d 22 (1977).
The Appellate Division has found that:
Merely because an association leases out a portion of its property, does not necessarily mean that it is no longer exclusively used for one of the purposes *316 enumerated in N.J.S. A 54:4-3.6. See City of Long Branch v. Monmouth Medical Center, supra, 138 N.J.Super. at 532-533 [351 A.2d 756]. If the property being leased is not used for a purpose enumerated in the act, then the corporation or association loses its tax exempt status. However, if the property leased is used for one of the purposes in the act, then the lessor-corporation is entitled to maintain its exemption and the lessee shoulders the tax burden.
[Ironbound Educational & Cultural Ctr. v. Newark, 220 N.J.Super. 346, 352, 532 A.2d 258 (App.Div.1987)(emphasis added).]
In Boys’ Club, supra, our Supreme Court stated that “occupancy [of a property owned by a charitable or religious organization] by an organization other than a charitable or religious one, such as an educational institution, would destroy the tax exempt status.” Id. at 400, 532 A.2d 258 (emphasis added.) This clear statement of our Supreme Court has gone unchallenged for over twenty years. Furthermore, our Supreme Court found specific authority for the above-quoted conclusion in the legislative history of the 1949 amendments to the statute. 72 N.J. at 400 n. 3, 371 A.2d 22. Thus, a religious or charitable organization which leases its property to an educational organization loses its tax exemption under N.J.S.A. 54:4-3.6. As the Supreme Court in Boys’ Club pointed out, educational institutions and religious and charitable institutions derive their exemptions from different phrases of N.J.S.A. 54:4-3.6. The unrepudiated statement quoted from Boys’ Club, and the legislative amendments which have changed N.J.S.A. 54:4-3.6 as it applies to educational, hospital, and moral and mental improvement organizations, but not as applied to religious entities, leads to the conclusion that, if a religious entity leases property to an otherwise exempt entity which is not a religious or charitable organization, it will lose its exemption. The concept is not easy to understand, is not intuitively obvious, and requires a careful analysis of the language of the statute and the history of amendments to the statute since 1977.
There is no dispute that property owned and used by the East Orange Board of Education for classrooms will be exempt from taxation. Logic might lead one to conclude that property owned by the Archdiocese (an exempt entity), and leased to the East Orange Board of Education (an exempt entity) for class *317 rooms (an exempt activity, “all buildings actually used for schools,” N.J.S.A. 54:4-3.6), is exempt from taxation. There is no intuitive basis for concluding that the exempt school use by a school of a property owned by an exempt religious entity should not be exempt from taxation. The analysis of The imposition of, and exemption from, taxation is a technical issue; the burden of proof of the entitlement to an exemption rests on the entity claiming the exemption. Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 214,172 A.2d 420 (1961).
An examination of the history of the amendments to N.J.S.A. 54:4-3.6 modifying the exclusive use requirement of the statute as it applies to entities qualifying for exemption because they are organized as educational, hospital, or moral and mental improvement organizations supports the conclusion that the exclusive use requirement still applies to religious and charitable organizations. Prior to 1977, N.J.S.A. 54:4-3.6 read as follows:
The following property shall be exempt from taxation under this chapter: All buildings actually used for colleges, schools, academies or seminaries; ... all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women, and children, or for religious, charitable or hospital purposes, or for one or more such purposes____
The Laws of 1977, c. 370 amended the statute to read as follows:
All buildings actually used for colleges, schools, academies, or seminaries, provided that if any portion of such buildings are leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, said portion shall be subject to taxation and the remaining portion shall be exempt; ... all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women, and children, or for religious, charitable or hospital purposes, or for one or more such purposes____
[Amendments underlined.]
The legislative statement accompanying the bill explained:
This bill permits colleges, schools, academies or seminaries which are tax exempt, to lease a portion of its property to organizations or businesses which do not have tax-exempt status. The portion of the property so leased would be subject to taxation. This would permit colleges to rent part of their facilities to private retail establishments, such as banks or fast food operations, for the convenience of their students.
[Assembly Banking and Insurance Committee, Committee Statement to Assembly Bill No. 3260, (November 28, 1977).]
*318 Thus, twenty years ago, the Legislature began to provide for partial exemption for property not exclusively dedicated to an exempt use by first granting such partial exemption for educational institutions. In 1983, this partial exemption concept was extended to hospitals. In Assembly Revenue, Finance and Appropriations Committee, Statement to Assembly Bill No. 1974 (December 13, 1982), the Assembly, in granting the hospitals the ability to retain a partial exemption, commented that:
[t]he purpose of this bill is to permit certain hospitals to lease space within the facility and retain its tax exempt status on the remainder of the property. Occasionally, there are portions of hospital property which are not being fully utilized. That space could be rented to nonemployee physicians and other health care related professions to provide a service within the hospital utilizing hospital equipment and laboratory services. This would produce rental income for the hospital and allow it to maximize the investment in laboratory services and equipment, all of which would serve to reduce total health care costs.
The Senate, in an identical comment, also recommended the amendment. The relevant portion of the statute was then amended to read:
all buildings actually and exclusively used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be stibject to taxation and the remaining portion only shall be exempt____
[L. 1983, c. 224 (emphasis added).]
The relevant portion with respect to the religious and charitable organizations then read:
buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women, and children, or for religious, or charitable purposes, or for one or more such purposes____
[L. 1983, c. 224.]
In 1985, the partial exemption provision was extended to moral and mental improvement entities. The Laws of 1985 further amended N.J.S.A 54:4-3.6 to separate the moral and mental improvement exemption from the religious and charitable exemption and to grant them a partial exemption similar to that provided to hospitals in 1983. The Assembly commented that:
*319 [t]his bill [Assembly Bill No. 2246], as amended by the Assembly Commerce and Industry Committee, would permit an association or corporation which is organized exclusively for the moral and mental improvement of men, women and children, to retain a tax exemption on its property if a portion of the property is leased to a profit-making enterprise. As amended, the bill permits an exemption on that portion of the property actually used by the association or corporation; the remainder of the property, if leased to a profit-making entity, would be subject to taxation.
This bill gives this type of association the same type of exemption now available to colleges, academies or seminaries. As the law governing exemptions for associations and corporations organized for the moral and mental improvement of men, women, and children now reads, a tax exemption is available under B.S. 54:4-2.6 only in eases in which the property in question is actually and exclusively used for the moral and mental improvement of men, women, and children.
[Assembly Commerce and Industry Committee, Statement to Assembly Bill No. 2246, (October 18, 1984).]
This comment demonstrates the legislature’s awareness of the difficulties with requiring exclusive use for an exempt purpose, and a desire to put moral and mental improvement entities on an equal footing with educational institutions and hospital facilities by allowing a partial exemption. The relevant statutory provisions in N.J.S.A. 54:4-3.6 now read:
all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women, and children, provided that if any portion of a building used for that purpose is to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the rernaining portion only shall be exempt; all buildings actually and exclusively used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt____(Emphasis added)
As Judge Hamill noted in Jersey Shore Medical Ctr., supra, 14 N.J. Tax at 57, the phrase “or for one or more such purposes” was deleted from the statute in the 1985 revision. Ibid. Although she determined that such reference was deleted “with no explanation,” Ibid., the legislative history shows that the Legislature considered the particularities of each exemption and carefully carved out exceptions for partial exemption where desirable. It first granted a partial exemption to hospitals to maximize investment returns and reduce total health care costs. Later, partial exemption was extended to moral and mental improvement entities to confer on *320 them similar treatment received by educational and hospital entities. The fact that the religious and charitable use exemption retained its exclusive use requirement language, taking into consideration the statute’s legislative history and its close proximity to other exemptions which were amended, presents a strong argument that it was meant to be left alone. In summary, although the Legislature has modified the exclusive use test of N.J.S.A. 54:4-3.6 with respect to educational, hospital, and moral and mental improvement entities, it has not modified the test with respect to religious and charitable entities. That stricter requirement results in the conclusion that the leasing of all or part of otherwise exempt property by an exempt religious organization will void the tax exemption for the entire property.
Additionally, I note that to the extent that the property was leased by the Archdiocese to the Board of Education, the Archdiocese received rent. As a general rule, investment or revenue raising activities of exempt organizations do not enjoy the same exemptions from taxation as do those activities which are specifically exempt from taxation despite the fact that the revenues are devoted exclusively to the charitable, religious, or other exempt activities of the exempt organization. “Qualification for exemption under § 3.6 depends on the use of the property, not the use of the funds generated by the property.” Christian Research Inst. v. Dover, 5 N.J. Tax 376, 386 (Tax 1983).
Y.
Accordingly, I find that the Archdiocese has demonstrated that the former parish properties were actually and exclusively used for religious worship and religious purposes, except for the years in which a portion of the Our Lady of All Souls property was leased to the East Orange Board of Education. Judgments will be entered exempting all property under appeal from taxation, except for that parcel of the Our Lady of All Souls property which was leased to the East Orange Board of Education.