LARIO, J. T. C.
This is an appeal from a determination of the Mercer County Board of Taxation affirming Trenton’s denial of tax exempt status for the tax year 1979 for premises known as Block 55, Lot 163H, owned by Trenton Church of Christ.
Plaintiff claims it is entitled to an exemption for the property in question under the provisions of N.J.S.A. 54:4-3.6 in that (1) it is a building used for religious purposes and/or (2) a building occupied as a parsonage as provided in the statute.
*269 Neither ownership as of the date of the assessment nor the amount of the assessment is in dispute. The sole issue involved is whether plaintiff’s use and occupancy of the subject property qualifies under either of the above uses.
The Trenton Church of Christ (church) is a duly organized religious corporation of the State of New Jersey. The church’s regular meeting house, which is its headquarters, is located in Hamilton Township, New Jersey, where it owns and maintains a house of worship and a parsonage. It conducts its ministry at many other places, “wherever the individuals are exercising ministry,” including at properties it does not own, such as visitation at hospitals, etc.
In September 1977 the church acquired title to 341 Center Street, Trenton, the subject premises, which it named “Liberty House” (house). The property was acquired to be opened by plaintiff as an “Inner-City Ministry.”
An Inner-City Ministry was described as the operation of a program consisting of bible classes, bible study classes, chapel, Sunday services and many programs for youth and families of the neighborhood. The program is conducted by the persons who reside in the house and are considered by the church to be “officiating ministers,” sometimes referred to as “staff members.” They are authorized by the church to preach the gospel and administer the church’s purpose and actually conduct its program, which duties are referred to as “ministries.”
The church’s policy does not require any minimum educational requirements nor does it have a formal ordination ceremony for acceptance of certain individuals whom it recognizes as officiating and/or pulpit ministers.
The subject property was described as being a three-story row house, approximately 12 to 15 feet wide. The first floor consists of a living room which spans almost the entire length of the house, followed by a kitchen. The second floor has two bedrooms and bath, and the third floor has three small bedrooms. It also has a partial basement and garage.
*270 On October 1,1978 there resided in the house Arthur McBride and Susan McBride, his wife, Laura Hamilton (now Mrs. James McBride), Jean Wolf, Nancy Harle and Karen Blucher, all of whom were ordained ministers of the church. There was conflicting testimony whether James McBride, also an ordained minister, resided there on that date.
At that time, or during the 1979 tax year, also residing in the house, were four foster children, the oldest about eight years old, who were under the care of Mr. and Mrs. Arthur McBride. The McBrides received compensation from the State of New Jersey for the care of these foster children. They do not receive any stipend from the church. During the year 1978 Arthur acquired outside employment which, presumably, has continued to the date of trial.
The other persons living in the house received various stipends from the church. Laura Hamilton and Jean Wolf were full-time ministers until they left in August 1979 and 1980, respectively. As of October 1, 1978 Jean Wolf ran a day care program. Nancy Harle and Karen Blucher, who have also since moved, were part-time ministers. Ms. Harle was employed by the Y.W.C.A. as a gymnastic coach in the evenings for about ten hours a week. While Ms. Blucher resided at Liberty House she was also employed by Hamilton Township Public Schools as a part-time tutor.
Vernon Kimble Forrister testified that he is the minister/director of Liberty House and as such he is the officiating director; however, he does not reside in the house. He sets up the programs for Liberty House and trains the staff members and supervisors therein.
On October 1,1978 the ministry’s program generally consisted of bible classes, and chapel, and it also included educational and religious training for local children together with other activities for the children which were not strictly religious in nature. The children range in age from four to five years old and upwards, with the oldest being about 16 years. The Sunday services did not begin until the fall of 1980.
*271 Forrister stated that the various program activities were held primarily on the first floor and that they also utilized the basement and garage for weight-lifting and sewing classes.
The staff members residing there used the second and third floors as their bedrooms, and when the building was not being used for religious purposes it was used as a regular residence, including the right of the members to invite their friends for social visits and activities not related to the programs.
The expenses of all utilities, such as electricity and heat, are paid by the church which, in turn, is reimbursed by persons living therein on a proportionate basis. The director, who does not reside there, does not contribute to the utility expenses. Real estate taxes, maintenance and repairs are paid for by the church, for which it is not reimbursed.
N.J.S.A. 54:4-3.6, in pertinent part, exempts all buildings “actually and exclusively used” in the work of associations or corporations organized exclusively for religious purposes. The question to be resolved is whether the church’s use of this property meets the criteria of the statute.
Since plaintiff is a duly incorporated religious association, it has the right to set the qualifications, including educational requirements, of its ministers. Having established its requirements, the church alone has the right to rule whether a person has met its qualifications. The church, by determining and accepting the staff members of Liberty House as its spiritual representatives, the municipality cannot question that determination. U.S.Const, Amend. I. Consequently, there is no question but that the staff members residing at Liberty House as of October 1, 1978 were ordained ministers of the Trenton Church of Christ. However, although a religious organization’s right to establish its minister’s qualifications is protected by the First Amendment of the U.S. Constitution, it does not necessarily follow that buildings occupied and used by all such ministers, are entitled, a fortiori, to tax exempt status under the provisions of N.J.S.A. 54:4-3.6. Plaintiff must establish that use and occupancy of the buildings meet the requirements mandated by the Legislature.
*272 We must now determine whether the activities conducted within Liberty House were actually and exclusively used for the purposes set forth in the statute under review.
The general rule is well-settled that statutes granting exemption from taxes must be strictly construed against those claiming such exemption. Boy’s Club of Clifton v. Jefferson Tp., 72 N.J. 389, 398, 371 A.2d 22 (1977), and cases cited therein.
A large portion of the evidence presented was vague and general, consisting of hearsay or unsupported conclusions as to exactly what programs existed as of October 1, 1978 or during the tax year 1979.
Forrister, who attempted to give a complete detailed description of the use and operation of the house, was the minister/director of Liberty House on October 1, 1978. At that time he was a full-time seminary student at Princeton Seminary, from 8 a. m. to 5 p. m. During this time, he received a salary of $150 a month for activities not connected with Liberty House.
Another witness, J. M. Roberts, testified that he was an elder of the church, and he attempted to describe the activities conducted at Liberty House. He did not become an elder until the fall of 1980. Billy J. Henry, who testified that he was the pulpit minister at Liberty House, did not move to the Trenton area from California until October 1980.
It is unquestionable that many of the activities conducted at Liberty House fall within the religious purposes set forth within the statute; however, there are many activities that do not.
During school days there were no children to minister to, at least not until after 3 p. m. The record is completely void of any evidence detailing the use of the property during those daytime hours when the children were not in attendance. Although general statements were made that there were Sunday worship services conducted on the premises. Forrester testified to the contrary, stating that Sunday services did not begin until 1980..
*273 During the tax year in question the duties of Mr. and Mrs. Arthur McBride were not referred to as part-time ministries. McBride was gainfully employed in work unrelated to the ministry and, as testified to by one of plaintiff’s witnesses, was “presumably supporting his wife.” From this evidence I infer that Mrs. McBride’s religious activities and duties within the house were not sufficient to warrant compensation from the church. In addition, during the tax year in question this couple had within their custody four foster children for whom they received compensation from the State.
Several of the other occupants were also employed outside the property in activities that were not related to their ministry; however, they still used the house as their residence.
The staff members residing in the house could use the property in an unrestricted fashion, as they would normally in their own private residences if they had one, and they pay their proportionate share of utility expenses, a factor more consistent with recognition of a residential use than a religious use.
In Cresskill v. Northern Valley Evang. Church, 125 N.J.Super. 585, 312 A.2d 641 (App.Div.1973), the court held:
[Assuming the use of the building for the stated purposes, it is of no aid to the respondent. In order to qualify for an exemption as property used for religious worship or religious purposes, the property must be used ‘exclusively’ for such purposes. N.J.S.A. 54:4-3.6. A building that is used in the religious work of a church and which is additionally utilized as the residence of an employee of the religious corporation (other than one of the officiating clergymen), quite obviously is not being devoted exclusively to religious purposes in the ongoing work of the church, [at 587, 312 A.2d 641]
In analyzing the facts concerning the use of the premises in question, all doubts are resolved against those seeking the benefit of a statutory exemption. Teaneck Tp. v. Lutheran Bible Inst., 20 N.J. 86, 90, 118 A.2d 809 (1955).
From the evidence submitted I find that the subject property has been substantially utilized for purposes other than religious and that plaintiff has failed to meet its burden of proof to establish that the building was actually and exclusively used for the purposes set forth in N.J.S.A. 54:4-3.6.
*274 The next question to be addressed is whether the subject property is entitled to be exempt as a parsonage. In order for an exemption to be granted under this provision, the building must not only be a “parsonage” but it must also be occupied by the “officiating clergyman” of the religious corporation. The word “parsonage” as used in this statute was heretofore defined by our court, drawing from Webster’s New International Dictionary (2d ed. unabridged) as: “The glebe (land) and house, or the house only, appropriated by a parish or ecclesiastical society to the maintenance or use of the incumbent or settled pastor or minister.” St. Matthew’s, etc., Deaf v. Tax Appeals Div., 18 N.J.Super. 552, 556, 87 A.2d 732 (App.Div.1952).
It is doubtful whether the building in question is a parsonage, that is, whether the premises were used as a residence of its settled pastor or minister; however, there is no doubt that the building is not occupied by the officiating clergyman of plaintiff corporation. In the St. Matthew’s case, the Appellate Division, speaking through Judge Francis (who later became Justice Francis), in construing this language stated:
... [I]t would not be reasonable to conclude that the Legislature intended to exempt the residence of an itinerant evangelist. Ham Evan. Assn. v. Matthews, 300 Ky. 402, 189 S.W.2d 524, 168 A.L.R. 1216 (Ct.App.1945). Otherwise any individual whose home is in New Jersey and who incorporated here for religious purposes and who evangelized all over the country would be entitled to the immunity. Something more localized and more or less permanent, both as to character of the pastor and nature of the persons served by him, must have been intended as the necessary qualifications. Consequently an “officiating clergyman” when textually associated with “parsonage” must be a settled or incumbent pastor or minister, that is, a pastor installed over a parish, church or congregation, [at 558, 87 A.2d 732]
Although the organizational structure of plaintiff’s church was stated to be informal, the building in question is owned and under the control of the elders whose headquarters are located in Hamilton Township. None of the elders reside in Liberty House. Forrester testified that he is the minister/director and as such is the officiating director of Liberty House. Billy J. Jenry testified that he is the pulpit minister of Liberty House. Neither of the latter gentlemen resided in Liberty House. Although both of them were appointed to their respective positions *275 after October 1, 1978, it is clear from the evidence presented that both of these positions are officiating positions within the formal structure of the Trenton Church of Christ and both were intended as supervisory positions over the staff members at the subject property. These two positions were not filled as of October 1, 1978. It is equally clear that none of the staff members of Liberty House heretofore named who resided therein was either an elder of the church or an officiating director or a pulpit minister of Liberty House. There was no officiating clergyman, as defined in N.J.S.A. 54:4-3.6, residing in Liberty House as of October 1, 1978, and its activities were being officiated over and directed by the elders of the church.
Based upon the above findings I conclude that the subject building is not entitled to tax exempt status as a parsonage.
The judgment of the Mercer County Board of Taxation is hereby affirmed.