MENYUK, J.T.C.
Plaintiff City of Long Branch appeals a judgment of the Monmouth County Board of Taxation applicable to tax year 2001, which exempts property used to house visiting rabbis and other clergy and also to store books and furniture. Defendant Ohel Yaacob Congregation (the “Congregation”) claims that the property is entitled to exemption pursuant to N.J.S.A. 54:4-3.6 because it is a parsonage or, alternatively, because it is a building actually used in the work of an association or corporation organized exclusively for religious purposes.
The Congregation is a nonprofit religious corporation formed in 1982 or 1983. It is an Orthodox Jewish congregation and has a synagogue located in Deal, New Jersey. The subject property is in Long Branch, but is adjacent to the synagogue in Deal. It consists of a two-story masonry and concrete building dating from about 1980, and, at some time prior to its acquisition by the Congregation in June 1995, the property was apparently used as a summer hotel. It has three residential living units, one on the first floor and two on the second. There is an attached garage and also a basement which holds utilities and the heating system.
The sole witness at trial was Eli Ben Haim, an ordained rabbi, who serves as both cantor and rabbi to the Congregation. . He has been employed by the Congregation for nine years.[1] The Congregation also employs a year-round rabbi, Michael Haber, who has served the Congregation for approximately fifteen years, a year-round cantor, who was not further identified, and certain other clergy who serve the Congregation only during the summer months. The Congregation owns one house which has been granted an exemption as a parsonage.
Cantor Ben Haim testified that cantors represent the congregation in prayer and song, read the Torah, and are an integral part *514 of the daily and Sabbath religious services. They also officiate at weddings and funerals, and give bar mitzvah lessons. He further testified that Rabbi Haber’s duties include giving lectures and sermons to the Congregation, counseling members, preparing boys for their bar mitzvahs, officiating at weddings and bar mitzvahs, and leading all of the daily and Sabbath religious services except during the busy summer months, when visiting clergy conduct some of the services.
Cantor Ben Haim testified that the visiting clergy have no role in the day-to-day operations of the Congregation. Rather, the Congregation is administered by a lay committee, which consults with Rabbi Haber only in his capacity as a religious leader. Cantor Ben Haim further testified that the committee consults not only with Rabbi Haber, but also with other clergy serving the Congregation, including himself, his father, Rabbi Baruch Ben Haim, who is customarily present at the Congregation during the summer, and Cantor Moms Kassin, who resides in Brooklyn, but who regularly serves as an additional cantor during the summer months. When asked during cross-examination to place the clergy of the Congregation in a hierarchy, Cantor Ben Haim assigned his father the highest status, with Rabbi Haber next, and then himself.
According to Cantor Ben Haim, his father began spending summers at the New Jersey shore in approximately 1950, and that over the years, increasing numbers of the Sephardic Jewish community in Brooklyn, New York, of which he and his family are members, migrated to the shore each summer. The seasonal residents are currently concentrated in the area of Deal, New Jersey. Cantor Ben Haim estimated that 2,000 to 3,000 such families (not all members of the Congregation) move to the area each summer, and that the Congregation, which ordinarily consists of 60 to 80 families, grows to 400 or 500 families from late May through September or early October each year. Though not explicitly stated by Cantor Ben Haim, I infer that some of the families that had originally resided at the shore only during the summer eventually became year-round residents and formed the *515 Congregation while still retaining ties to their former Brooklyn congregations and clergymen, including Rabbi Ben Haim and Rabbi Kassin.
To accommodate the larger population of the Congregation during the summer months, it is necessary to increase the number of Sabbath services. During the winter months, there is generally one service on Friday night, two on Saturday morning (one for adults and a second for children), and one late Saturday afternoon. During the summer months, there are at least one or two additional Saturday morning services. The large summer congregation also places a burden on the year-round clergy because the expanded membership multiplies the demand for clerical services such as counseling, teaching and officiating.
Accordingly, a number of clergymen regularly visit the Congregation during the summer and assist with the increased clerical load. Among the summer visitors are Rabbi Baruch Ben Haim, Cantor Morris Kassin, Cantor Steve Tawil, and occasionally others. The summer clergy lead or participate in the additional religious services, and generally function in the same manner and perform similar duties as the year-round clergy. The Congregation also sometimes invites senior rabbis from congregations in Brooklyn whose members spend the summer in the Deal area. Appearances by those rabbis have the effect of attracting additional summer attendance and financial support for the Congregation. Cantor Ben Haim testified that the summer membership provides eighty percent of the monies needed to support the Congregation for the entire year.
The Congregation purchased the subject property for the purpose of housing the visiting clergy. Cantor Ben Haim testified that, as Orthodox Jews, the clergy are not permitted to drive or to be driven on the Sabbath or during holidays, which may extend anywhere from two to eight days. Accordingly, it is necessary for the Congregation to provide a place in close proximity to the synagogue in order for the Congregation to gain the services of the additional clergy during the busy summer months. Cantor Kassin has occupied one of the units in the subject property for *516 the past eight or nine summers. Cantor Tawil usually occupies one of the units each summer. The remaining unit is used by other invited clergy. No rent or other fee is paid by the visiting clergy for the accommodations.
Cantor Ben Haim testified that the subject property is also needed to store religious books and additional furniture used during the summer. The religious books are stored in the garage and consist of additional copies of the books needed for regular religious services by the expanded summer population and also books needed only for certain holidays. Cantor Ben Haim stated that, prior to the acquisition of the subject property, the books had been stored in the basement of the synagogue, but had repeatedly sustained water damage and had to be replaced. From October to May, the Congregation also uses the subject property to store extra furniture and chairs that are needed only during the summer.
Finally, Cantor Ben Haim testified that, in the winter, there are sporadic visits by clergy when there is some event or religious holiday which would cause members residing in Brooklyn to come to Deal for a weekend or other short period outside of them usual seasonal residence. During those visits, the clergy stay at the subject property.
The Congregation first claims that the subject property is a parsonage, and thus exempt under N.J.S.A. 54:4-3.6. The relevant portion of N.J.S.A. 54:4-3.6 provides:
The following property shall be exempt from taxation under this chapter: ... the buildings, not exceeding two, actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State, together with the accessory buildings located on the same premises; the land whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which is devoted to the purposes above mentioned and to no other purpose and does not exceed five acres in extent; ... provided ... the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit ____The foregoing exemption shall apply only where the association, corporation, or institution claiming the exemption owns the property in question and is ... authorized to carry out the puiposes on account of which the exemption is claimed
*517 Citing Friends of Ahi Ezer Congregation, Inc. v. City of Long Branch, 16 N.J.Tax 591 (1997), the City asserts that the visiting clergymen are not “officiating clergymen,” and that the property is therefore not eligible for the parsonage exemption. That is the only element of the statutory exemption which the City contends is lacking.[2]
In Friends of Ahi Ezer Congregation, a house occupied by a rabbi who served as an assistant to the spiritual leader of the congregation, was denied an exemption because he was not the “officiating clergyman.” In making that determination, Judge Axelrad noted that “officiating clergyman” has been defined as “a settled or incumbent pastor or minister, that is, a pastor installed over a parish, church or congregation,” citing St. Matthew’s Lutheran Church for the Deaf v. Division of Tax Appeals, 18 N.J.Super. 552, 558, 87 A.2d 732 (App.Div.1952), and that a dictionary definition of “officiating” includes “perform[ing] the duties and functions of an office or position of authority” and “serv[ing] as a priest or minister at a religious service.” Friends of Ahi Ezer Congregation, supra, 16 N.J.Tax at 595. To be consistent with these definitions, she concluded that the court must look at the extent of the clergyman’s activities performed for the religious corporation. “If the duties sound like those performed by congregational leaders of all religious denominations, the clergyman is considered an officiating clergyman of the religious corporation.” Ibid.
Cantor Ben Haim did not identify any one person as the spiritual leader of the Congregation. Rather, he testified that the visiting clergy performed essentially the same religious duties as the year-round clergy. When he was asked how he thought a *518 congregant would respond to an inquiry by a stranger as to the identity of the Congregation’s rabbi, his answer was, essentially, that different congregants might respond with the name of any one of a number of the clergy, including the year-round clergy and the visiting clergy. Similarly, he emphasized that the lay committee in charge of the day-to-day management of the Congregation consulted with a number of clergy, and not just with the year-round rabbi, Michael Haber. Finally, in ranking the clergy according to them status with the Congregation, he placed his father, Rabbi Baruch Ben Haim, first, and Rabbi Haber second. The Congregation’s answers to interrogatories referred to Rabbi Haber as the spiritual leader of the Congregation during the winter.
Our courts have repeatedly held that, because exemption is a departure from the principle that all property should bear its just share of the public burden of taxation, tax exemption statutes are strictly construed against those claiming exemption. New Jersey Carpenters Apprentice Training and Educ. Fund v. Kenilworth Bor., 147 N.J. 171, 177, 685 A.2d 1309 (1996), cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997); Princeton Univ. Press v. Princeton Bor., 35 N.J. 209, 214, 172 A.2d 420 (1961). The claimant bears the burden of proving its entitlement to an exemption. New Jersey Carpenters Apprentice Training and Educ. Fund, supra, 147 N.J. at 178, 685 A.2d 1309; Princeton Univ. Press, supra, 35 N.J. at 214, 172 A.2d 420. Even though this appeal has been brought by the City, the burden of proof is still on the taxpayer seeking exemption. West Orange Tp. v. Joseph Kushner Hebrew Acad., 13 N.J.Tax 48, 52 (1993); City of Hoboken v. Trustees of Stevens Inst., 11 N.J.Tax 70, 73 (1990), aff'd per curiam, 247 N.J.Super. 215, 588 A.2d 1262 (App.Div.), certif. denied 126 N.J. 336, 598 A.2d 893 (1991). All doubts are resolved against those seeking the benefit of the exemption. Friends of Ahi Ezer Congregation, supra, 16 N.J. Tax at 596.
I find that, while some of the visiting clergy enjoy positions of great prestige and status with the members of the Congregation and may be “officiating clergymen” at their congregations in Brooklyn (whose members may also be members of the Congrega *519 tion), none of the visitors are the “settled or incumbent pastor or minister” of the Congregation. They are not “installed” over the Congregation. The visiting clergy are just that — visitors—and, for much of the year, they are not available to teach, lead, or participate in religious services, to give sermons, or to officiate at the Congregation’s weddings, funerals, and bar mitzvahs. Those duties are performed by the year-round clergy from October until May. The duties of seasonal clergy simply do not “sound like” those customarily performed by congregational leaders. Id. at 595. In sum, I conclude that the subject property is not eligible for exemption as a parsonage.
I also find that the subject property is not being employed as a parsonage, within the meaning of the statute. The clear implication of the New Jersey cases which have considered the nature of a parsonage is that the term means a residence or home, and not merely a hotel room, suite, or other temporary housing. See, e.g., St. Matthew’s Lutheran Church for the Deaf, supra, 18 N.J. Super, at 557, 87 A.2d 732, which found the clearest statement of the term “parsonage” in Assessors of Boston v. Old South Soc’y in Boston, 314 Mass. 364, 50 N.E.2d 51, 52 (1943): “a house owned, or held in trust, by a religious organization for religious uses in which a minister serving those uses lives.” See also, Trenton Church of Christ v. City of Trenton, 3 N.J.Tax 267, 274 (1981) (defining a parsonage as a residence of the settled pastor or minister of a religious corporation).
There is no evidence to suggest that the subject property was a home or place of residence. Rather, the testimony indicated that the property was used to provide temporary accommodations for the visiting clergy, within walking distance of the synagogue, in accordance with the practices of Orthodox Judaism.
The Congregation alternatively claims exemption pursuant to that portion of N.J.S.A. 54:4-3.6 which provides:
The following property shall be exempt from taxation under this chapter: ____all buildings actually used in the work of associations and corporations organized exclusively for religious purposes, including religious worship, or charitable purposes, provided that if any portion of a building used for that purpose is leased to a *520 profit-making organization or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion shall be exempt from taxation, and provided further that if any portion of a building is used for a different exempt use by an exempt entity, that portion shall also be exempt from taxation----
There is a threshold issue of whether a residential property which is not a parsonage may nevertheless qualify for exemption as property used in the work of a religious organization. Put another way, is a “parsonage” the only type of residential property owned by a religious organization which is eligible for exemption, and does the specific exemption for parsonages preclude qualification for exemption of other categories of residential property used for religious purposes?
It might be expected that a review of the ease law would disclose whether convents, monasteries and similar residential properties which could be compared with the use of the subject property had been found eligible for exemption as property used for religious purposes. There is, unfortunately, little such case law. See, e.g., Sisters of Charity of Saint Elizabeth v. Collector of Chatham, 52 N.J.L. 373, 20 A. 292 (E. & A. 1890) (finding building exempt because used for charitable purposes, where used by a religious order as a residence and a school for the training of its members in the charitable work of the organization); Congregation of Mission of St. Vincent De Paul in Bordentown v. Brakeley, 67 N.J.L. 176, 50 A. 589 (Sup.Ct.1901) (holding exempt as used for charitable purposes, a building used by members of a religious order engaged in charitable activities elsewhere as a summer home of recuperation). But see Harvey Cedars Bor. v. Sisters of Charity of St. Elizabeth, 163 N.J.Super. 564, 395 A.2d 518 (App.Div.1978) (holding that use of property as a summer residence or vacation home for nuns and others doing charitable work elsewhere was ineligible for exemption as property used either for religious purposes or charitable purposes).
Moving beyond convents and monasteries, the case law does not immediately reveal a consistent answer to the question of whether residential property not amounting to a parsonage may nevertheless be exempt as property used for religious purposes. In City of *521 East Orange v. Church of Our Lady of the Most Blessed Sacrament, 21 N.J.Misc. 374, 34 A.2d 297 (Bd. Tax App.1943), the issue was whether a building was entirely exempt as a building actually and exclusively used for religious purposes or whether it was limited to a then existing $5,000 exemption available for parsonages. The parish rector and assistants necessary for the conduct of the religious work of the parish lived in the budding. In addition to the building’s use as a residence, it contained an office used for the business of the parish and the parish school. Marriage records were kept in the building, some church meetings were conducted there, church supplies necessary for the operations of the church were stored in the basement of the building, and the rector occasionally performed marriage ceremonies in the building. The State Board of Tax Appeals held that the building was eligible only for the parsonage exemption. By virtue of its use as a residence, the building was not “exclusively” used for religious purposes.
Three years later, the Division of Tax Appeals found that the residential use as a parsonage of the same building incident to the performance of exempt activities would not defeat the total exemption of the building. City of East Orange v. Church of Our Lady of the Most Blessed Sacrament, 25 N.J.Misc. 58, 50 A.2d 390 (Div.Tax App.1946). In support of its finding, the Division cited Jersey City v. Beth-El Baptist Church, 18 N.J.Misc. 208, 12 A.2d 152 (Bd. Tax App.1940), which exempted a two-family building owned by a religious corporation. The first floor was employed as a house of worship and the second was employed as a dwelling for its minister. The Board concluded that, where the statute exempted a building exclusively devoted to religious worship and also a building actually occupied as a parsonage by an officiating clergyman, the statute should not be construed to deprive the religious corporation of its exemption merely because one building housed both its church and its parsonage.
More recently, the Appellate Division affirmed an exemption for a Salvation Army Retired Officers’ Home, which was primarily used for Salvation Army officers retired because of old age and *522 infirmity. City of Asbury Park v. Division of Tax Appeals, 41 N.J.Super. 504, 125 A.2d 411 (App.Div.), certif. denied, 22 N.J. 574, 126 A.2d 910 (1956). As explained by the court, the compensation received by the officers, all ordained ministers, during their active careers was generally less than other employees of the organization. The demands of the work were said to have been so heavy as to have broken their health in a substantial number of cases, presenting the organization with a serious problem. The home was intended as a means by which the Salvation Army could discharge its responsibilities to these officers as well as to other employees who arrive in old age in need after having given their lives in the service of the organization’s charitable endeavors. Id. at 506, 125 A.2d 411. The court found that the operation of the home constituted an important part of the work of the religious corporation, and that the home was actually and exclusively used in that work. Id. at 507,125 A.2d 411.
In Cresskill Bor. v. Northern Valley Evangelical Free Church, 125 N.J.Super. 585, 312 A.2d 641 (App.Div.1973), a residence used by the youth director of a church was determined to be ineligible for the parsonage exemption, because the youth director was not ordained and was not an officiating clergyman. The court also found that the property was not eligible for the religious purposes exemption, notwithstanding that the building was also used for Sunday school classes and other youth activities, because its use as a residence meant that it “quite obviously [was] not being devoted exclusively to religious purposes in the ongoing work of the church.” Id. at 587, 312 A.2d 641.
An analysis of these cases indicates that, when residences were denied exemption as property used for religious purposes, it was principally because the residential use was not viewed as advancing the work of the religious organization. Rather, the residential use was seen as a benefit to the clergyman or employee who was granted the use of the property by the organization. Accordingly, where there was residential use, a building could not be “exclusively” devoted to religious purposes.
*523 Since the decision in City of Long Branch v. Monmouth Med. Ctr., 138 N.J.Super. 524, 351 A.2d 756 (App.Div.1976), aff'd o.b. per curiam, 73 N.J. 179, 373 A.2d 651 (1977), however, courts have been increasingly willing to consider that uses not in and of themselves charitable or religious may nevertheless be consistent with charitable and religious purposes, and will not destroy an exemption which requires exclusivity of purpose. In City of Long Branch v. Monmouth Med. Ctr., the Appellate Division construed the exclusive use requirement of the hospital exemption to require only that the property be reasonably necessary for the proper and efficient operation of the hospital and affirmed an exemption for apartments and housing facilities for nurses, interns and residents. The below market rents charged to the staff served as a subsidy to attract qualified people to the hospital staff, and it was “obvious” that by providing nearby housing, the hospital was better able to function on a twenty-four hour basis. Id. at 532, 351 A.2d 756.
In St. Ann’s Catholic Church v. Hampton Bor., 14 N.J.Tax 88 (1994), Judge Hamill concluded that the then-existing requirement of “actual and exclusive” use of the property in the case of religious organizations could no longer be interpreted literally after the decision in City of Long Branch v. Monmouth Med. Ctr. To construe the religious exemption more strictly than other exemptions would raise the issue of impermissible discrimination against property of religious organizations under the First Amendment. St. Ann’s Catholic Church, supra, 14 N.J.Tax at 99. The court accordingly applied a test of “reasonable necessity”: the exemption claimant must demonstrate a compelling need for the services performed by the resident of the property for which exemption is claimed, and also that those services are integrated with the exempt functions of the entity. Id. at 100.
Since the decision in City of Long Branch v. Monmouth Med. Ctr., there seems to be little doubt that a residence not amounting to a parsonage may nevertheless be eligible for exemption as property used for religious purposes. In Trenton Church of Christ v. City of Trenton, supra, 3 N.J.Tax 267, for example, the *524 court determined that a property used as the residence of various ordained ministers as well as other employees of the religious corporation was not eligible for exemption as a parsonage, because none of the occupants was an officiating clergyman. Id. at 275. While the court also found that the property was not used exclusively for religious purposes, it was not the use as a residence per se which destroyed the exemption. Rather, the Tax Court found that many of the other activities conducted at the house were not related to the ministry of the religious corporation. Id. at 272-73.
Moreover, N.J.S.A. 54:4-3.6 was amended by L. 2001, c. 18, to delete the word “exclusively,” from the religious property exemption. The legislation was approved on January 29, 2001, and provides that the amendment is retroactive to September 30, 1999, well before the October 1, 2000 assessment date applicable in this case. Neither party has challenged the applicability of the amendment to this ease.
I find that the Congregation has demonstrated that the subject property is reasonably necessary for its operation. A Congregation with a membership of 60 to 80 families which expands to 400 or 500 families in the summer can reasonably be expected to require additional clergy to handle the increased demands of the larger membership. While it is not inconceivable that the year-round clergy could handle the burden of the additional Sabbath services, I find credible Cantor Ben Him’s testimony to the effect that the day-to-day needs of the larger membership for teaching, officiating, and counseling services could not be handled by the year-round clergy. Because of religious restrictions as to how and when the clergy may travel on the Sabbath and on religious holidays, it is necessary for the Congregation to supply housing in close proximity to the synagogue in order to obtain the services of the visiting clergy. In other words, the subject building used for the housing of the visiting clergy is necessary for the proper and efficient operation of the Congregation during the summer months, and is not a mere convenience for the visiting clergy or for the Congregation. Further, the visiting clergy make it possi *525 ble for the Congregation to serve the enlarged membership during the summer months, and it is that membership which provides much of the financial support for the year-round operation of the Congregation.
That I have determined that a residential property not amounting to a parsonage is exempt as property used for religious purposes does not mean that the broader exemption is available for property which would otherwise qualify as a parsonage, except for the fact that the religious organization has already exhausted its entitlement to exemptions for two such residences. That such a claim is not beyond the realm of possibility is demonstrated by Deal Yeshiva, Inc. v. Deal Bor., 16 N.J.Tax 599 (1997). There, the court held that N.J.S.A. 54:4-3.6, which exempts “the buildings, not exceeding two,” actually used as parsonages, was properly construed as limiting a religious organization to two parsonages in the state, and not two in each taxing district as claimed by the taxpayer. Id. at 603.
A court may go beyond that which is necessary to decide a particular issue if a need for guidance exists. Busik v. Levine, 63 N.J. 351, 363-64, 307 A.2d 571 (1973); Estell Manor City v. Stern, 14 N.J.Tax 394, 419 (1995); Fort Lee Bor. v. Director, Div. of Taxation, 12 N.J.Tax 299, 310 n. 5 (1992), aff'd o.b. per curiam, 13 N.J.Tax 323 (App.Div.), certif. denied, 134 N.J. 563, 636 A.2d 521 (1993); West Milford Tp. v. Garfield Recreation Comm., Inc., 194 N.J.Super. 148, 155, 476 A.2d 333 (Law Div.1983). Although not strictly essential for a decision in this case, then, it will be helpful to address the availability of an exemption for a third parsonage under the more general exemption of property used for religious purposes.
There is, of course, the legal maxim expressio unius est exclusio alterius, meaning that the express mention of one thing ordinarily implies exclusion of all others. Fort Lee Bor. v. Director, Div. of Taxation, 14 N.J.Tax 126, 132 (1994). As applied here, the maxim would compel the conclusion that, because the Legislature has been very specific regarding the exemption of parsonages, the use of the more general exemption for property used as a residence *526 for religious purposes is precluded. While our Supreme Court has cautioned that the blind and mechanical application of the maxim can often lead to an improper interpretation of the statute being construed, Allstate Ins. Co. v. Malec, 104 N.J. 1, 8, 514 A.2d 832 (1986), the history of the parsonage exemption confirms the conclusion that the Legislature intended to place restrictions on the exemption available for parsonages, and that it did not intend to provide an alternative ground for exemption of a parsonage by resort to the religious purposes exemption.
In L. 1863, c. 278, § 2 “parsonages, with lots attached, not to exceed five thousand dollars in value” were exempted. The exemption was repealed by L. 1866, c. 487, § 5. In First Reformed Dutch Church of New Brunswick v. Lyon, 32 N.J.L. 360 (Sup.Ct. 1867), the former Supreme Court rejected a claim for exemption of a parsonage under a statutory provision exempting the endowment or fund of any religious society. It was asserted that the parsonage was an endowment of the church, because the money for its purchase was raised by the voluntary contributions of the members of the congregation. The court rioted the repeal of the previously existing exemption for parsonages, and concluded that it was not reasonable to believe that the Legislature had intended to continue the exemption for parsonages where that result could have been accomplished only by a forced construction of the word “endowment.”
The issue was more directly addressed in Church of the Redeemer v. Axtell, 41 N.J.L. 117 (Sup.Ct.1879). There, the court concluded that, “[t]he legislature having repealed the act of 1863, which expressly exempted a parsonage, manifestly did not intend to include it in the descriptive words ‘buildings erected and used for religious purposes.’ ”
The current parsonage exemption has its source in L. 1918, c. 236, § 203, which provided in relevant part:
The following property shall be exempt from taxation under this act, namely:
(4) ... all buildings actually and exclusively used in the work of associations and corporations organized exclusively for ... religious, charitable or hospital purposes ...; the building actually occupied as a parsonage by the officiating clergyman of *527 any religious corporation of this State and owned by said corporation, to an amount not exceeding five thousand dollars.
The statute was later amended to limit to two the number of buildings eligible for the parsonage exemption, L. 1962, c. 154, § 1, and to eliminate the restriction as to the amount of the exemption. L. 1964, c. 42, § 1. The history of the parsonage exemption indicates rather plainly a legislative intent to place specific restrictions on the availability of that exemption. There is no evidence that the Legislature ever intended parsonages to be included in the general category of property used for religious purposes. Parsonages have always been treated separately and, as an historical matter, have not been regarded as property used for religious purposes. I therefore conclude that, although a residential property not amounting to a parsonage may be exempt as used for religious purposes, a residence principally used as a parsonage is not eligible for the same exemption and is limited to the express provisions for parsonages.
Finally, the Congregation claims exemption because the property was used for storage of religious books and furniture. In Roman Catholic Archdiocese of Newark v. City of East Orange, 17 N.J.Tax 298, 313-15 (1998), aff'd, 18 N.J.Tax 649 (App.Div.2000), Judge Small examined whether the use of property for storage would destroy the exemption for a property otherwise used for religious purposes. Notwithstanding that N.J.S.A. 54:4-3.6, prior to its amendment by L. 2001, c. 18, required property to be “exclusively” used for religious purposes, he concluded that the storage of documents and artifacts of a religious nature or related to the operation of the church should be deemed a religious purpose consistent with the exemption granted by the statute. 17 N.J.Tax at 314-15.
In this case, the testimony was inadequate to establish whether the use of the property for storage, by itself, would entitle the property to the exemption. There was, for example, no testimony as to the quantity of the articles being stored. Apart from the testimony regarding the damp conditions in the synagogue basement where the books had previously been stored, there was no *528 testimony as to whether other storage places were available. Because of my finding that the housing of visiting clergy was a use of the subject property for religious purposes, and because the use of an otherwise qualified property for the storage of books and personal property used in the operation of the religious organization is consistent with the exemption of property used for religious purposes, I need not decide the issue. I conclude from the trial testimony that the use of the entire property meets the requirements for exemption set forth in N.J.S.A. 54:4-3.6.
In sum, I find that the Congregation has established that the subject property was actually and also exclusively used for religious purposes. Judgment will be entered exempting the subject property and affirming the judgment of the Monmouth County Board of Taxation.

 Although the testimony was not clear, the Congregation's answers to interrogatories, admitted into evidence on the stipulation of the parties, suggest that Cantor Ben Haim performs his duties for the Congregation primarily during the summer months.

 There is no contention that the Congregation has exceeded the number of buildings which are eligible for exemption as parsonages. The Congregation’s answers to interrogatories indicate that the Congregation owns one home in Deal which has qualified for exemption as a parsonage, although it is unclear precisely who resides there. Rabbi Haber owns his own home, and it is therefore not eligible for exemption. N.J S.A. 54:4-3.6; Ehrlich v. Passaic City, 15 N.J.Tax 561 (1995).