**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| CLOVER HILL REFORMED CHURCH, | ) | TAX COURT OF NEW JERSEY |
| | ) | DOCKET NO. 010731-2016 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TOWNSHIP OF HILLSBOROUGH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Decided:     March 23, 2018

Michael L. Ticktin, Esq., for plaintiff

Martin Allen, Esq., for defendant (DiFrancesco, Bateman, Kunzman, Davis, Lehrer & Flaum, P.C. attorneys)

DeALMEIDA, J.T.C.

The question before the court is whether a residence in Hillsborough Township qualifies for an exemption from local property taxes for tax year 2016 as a parsonage occupied by an officiating clergyman of a religious congregation within the meaning of N.J.S.A. 54:4-3.6. The central issue is whether the occupant of the house, the Minister of Music of the church that owns the property, satisfies the statutory definition of "officiating clergyman." For the reasons explained more fully below, the court concludes that the statutory requirements for an exemption for tax year 2016 have been met.

## I.  Findings of Fact

The court makes the following findings of fact based on the testimony and evidence admitted at trial.

Plaintiff Clover Hill Reformed Church (the "congregation") is a tax-exempt, non-profit religious organization incorporated under New Jersey law as the Reformed Dutch Church of Clover Hill on September 4, 1834. The congregation has been active in Somerset County since that time and presently meets in the church building on Amwell Road in Hillsborough Township.

The subject property is adjacent to the church building. The parcel of approximately 3.3 acres is designated in the records of the tax assessor as Block 164, Lot 3, and is commonly known as 888 Amwell Road. On the parcel sits a one-family house with approximately 2,032 square feet of living space comprised of three bedrooms, one bathroom, a living room, dining room, and kitchen on two floors. A small utility shed also sits on the property.

On December 15, 1965, a member of the congregation deeded the subject property to the congregation, subject to the life tenancy of the grantor's niece and her husband. The tenants resided at the property until October 31, 2014, when the tenancy was abandoned.

At that time, the Reverend John William Cherry was the Minister of Word and Sacrament and Pastor at the congregation. He had held those positions since 1977. Reverend Cherry, an ordained minister with a Masters of Divinity degree from the New Brunswick Theological Seminary, was approaching his planned May 1, 2015 retirement.

Reverend Cherry credibly testified that music is an important component of worship services at the congregation. According to the Reverend, the congregants' act of singing together is an integral reflection of their gathering for worship. The first hymn sung during a service is an adoration illustrating why the congregants have gathered; the second hymn ties into the theme of the sermon and scripture lessons of the service; and the third hymn symbolizes the departure of the congregants into the world as God's people intent on spreading peace. During his nearly forty years as head of the congregation, Reverend Cherry selected the music for services.

Near the end of his term, and at about the time that the congregation came into possession of the subject property, Reverend Cherry changed the procedure for selecting music. Recognizing gaps in his training in hymnology, Reverend Cherry found it increasingly difficult to develop a high quality music program for the congregation. He found it challenging to distinguish music proper for a particular worship service from music that was simply religious entertainment. With an eye on his obligation to plan for the future of the congregation after his retirement, Reverend Cherry formulated a proposal to create a new position, Minister of Music, to be responsible for all facets of the music program at the congregation, thus relieving Reverend Cherry's eventual successor from those duties.

Reverend Cherry consulted the Book of Church Order of the Reformed Church in America, which sets forth the doctrine and rules applicable to the congregation. He determined that, although there is no officially recognized position in the Reformed Church of Minister of Music, his proposal was consistent with church doctrine and rules. According to Reverend Cherry, the Reformed Church has a long history of designating an individual, historically known as the Choir Master, to be responsible for hymnal selection and other duties associated with providing music for worship services. Reverend Cherry noted that in the early history of the Reformed Church in America, the Choir Master was often the more consistent leadership figure at a congregation, given the limited number of clergy. Reverend Cherry's interpretation of the Book of Church Order was confirmed by the Stated Clerk of the Classics of Delaware-Raritan, the person responsible for providing guidance on church doctrine to congregations in the geographic region that includes plaintiff.

Reverend Cherry approached the Consistory, the congregation's governing body, to recommend the congregation secure the services of someone with appropriate expertise to be the

3

Minister of Music. The Consistory agreed with Reverend Cherry's proposal and ultimately appointed James R. Sparks to that position. Mr. Sparks served as Minister of Music on October 1, 2015, the statutorily relevant date for tax year 2016.

Mr. Sparks has been involved in church music since he was 12 years old. He has a Bachelor's of Music from Moorehead University, with a concentration in piano performance and a minor in vocal singing. As of October 1, 2015, Mr. Sparks was a full-time student at Westminster Choir College in Princeton, where he was pursuing a Master's Degree, focusing on collaborative piano and vocal coaching. While at Westminster Choir College, Mr. Sparks studied sacred music.[1]

As Minister of Music, Mr. Sparks is responsible for curating worship services along with the Minister of Word and Sacrament. The Reformed Church provides to all congregations uniform suggestions for the weekly liturgy. The suggestions includes scripture selections from the Old Testament and New Testament, as well as suggested psalms and gospel passages. The Minister of Word and Sacrament selects from the suggestions the biblical passages that will be delivered for each weekly service. Mr. Sparks selects music to match the readings. He chooses hymns with lyrics that reflect the teachings in the readings, and that will highlight the theme of the service musically. In addition, when making the selections, Mr. Sparks considers the "singability" of the hymns – the music must be practical to sing in a public setting by congregants who are not musically trained. Mr. Sparks chooses songs from the Reformed Church's approved hymnal and supplemental hymnal. It is necessary for Mr. Sparks to have a general knowledge of scripture to effectively select music that complements the written word to be delivered at the service by the Minister of Word and Sacrament.

---

[1] Mr. Sparks graduated from Westminster Choir College with a Master's Degree in December 2015, shortly after the relevant valuation date.

4

Mr. Sparks also serves as the congregation's Choir Director. Once he selects the music for the weekly service, he must teach the hymns to the choir members, whom he ultimately leads in singing the hymns at the service. Mr. Sparks performs all of the music on the organ during the weekly services. He is also responsible for providing all music for weddings and funerals held at the congregation. Although no witness testified that music was a required element of a wedding or funeral from a doctrinal standpoint, Mr. Sparks aptly asked during his testimony, "can you imagine a wedding without music or a funeral without music?" Mr. Sparks also curates the music for the congregation's yearly vacation bible camp, which includes religious music instruction to the students.

Mr. Sparks did not attend seminary and is not an ordained minister. Nor is he a member of the Reformed Church. He is a member of the Church of Christ, a non-denominational church under the same broad umbrella of Christianity as the Reformed Church. Mr. Sparks cannot substitute for the Minister of Word and Sacrament at services. Nor can he minister to members of the congregation to any extent greater than any Christian can minister to any other Christian seeking religious guidance. Any member of the congregation can, in theory, substitute for Mr. Sparks, although the trial record contains no evidence that another member of the congregation has the training to select appropriate hymns, train and lead the choir, and play the organ during services, or to fulfill his other responsibilities.

The congregation provides Mr. Sparks a modest salary as Minister of Music. He is also compensated by his right to use and occupy the subject property as his residence. According to the written employment agreement between the congregation and Mr. Sparks, the subject property "will be used solely as a parsonage" by Mr. Sparks. He is prohibited from subletting the property,

5

and, should he cease to be the Minister of Music, must vacate the residence within a month of the termination of his employment.

On August 19, 2015, the congregation applied to the municipal tax assessor for an exemption from local property taxes for the subject property for tax year 2016 as a parsonage pursuant to N.J.S.A. 54:4-3.6. The assessor thereafter requested in writing that the congregation answer a number of questions regarding the training and responsibilities of the occupant of the house. The congregation promptly responded to the assessor's information requests.

The municipal tax assessor thereafter denied the exemption. Written evidence of the exemption denial was not offered at trial. The only exemption decision in the record is the tax assessor's October 5, 2015, grant of an exemption for a separate parcel marked "church only." This document concerns the property adjacent to the subject property on which the church building sits. The fact that the granted exemption applies to the "church only" reflects the undisputed fact that the tax assessor denied an exemption for the subject property.[2]

On or about February 29, 2016, the congregation filed a Petition of Appeal with the Somerset County Board of Taxation challenging the assessor's denial of an exemption for the subject property.

On June 14, 2016, the county board issued a Judgment dismissing the congregation's Petition of Appeal without prejudice to the right to file an appeal in this court.

On July 21, 2016, the congregation filed a Complaint in this court challenging the denial of an exemption. The congregation alleged both that the subject property is exempt for tax year

---

[2]    The residence occupied by the congregation's Minister of Word and Sacrament, on a separate parcel owned by the congregation near the church building, was granted an exemption for tax year 2016 as a parsonage.

6

2016 pursuant to N.J.S.A. 54:4-3.6 as a parsonage, and, alternatively, as property used exclusively for religious purposes.

On August 2, 2016, the municipality filed a Counterclaim, requesting dismissal of the congregation's Complaint, and alleging that the assessment on the property is below true market value and should be raised.

On March 1, 2017, the municipality moved for summary judgment in its favor on the exemption question. The congregation opposed the motion.

On March 31, 2017, the court entered an Order denying the municipality's motion for summary judgment.

The matter was subsequently tried. Pursuant to an agreement of the parties, the court bifurcated the exemption question from the valuation claim raised in the municipality's Counterclaim.

## II. Conclusions of Law

The Legislature provided a parsonage exemption through enactment of N.J.S.A. 54:4-3.6. The statute provides an exemption for "the buildings, not exceeding two, actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State, together with the accessory buildings located on the same premises . . . ." N.J.S.A. 54:4-3.6. The exemption includes the land, not to exceed five acres, on which the premises are located, provided those lands are necessary for the fair enjoyment of the premises and are devoted to no purpose other than for use as a parsonage. Ibid. In addition, the statute provides that the exemption is met only if the premises, the land, and any entities occupying them are not conducted for profit and "shall apply only where the association, corporation or institution claiming the exemption owns the property in

7

question and is . . . authorized to carry out the purposes on account of which the exemption is claimed." Ibid.

The unambiguous language of the statute provides for an exemption if five factors are met: (1) the residence must be occupied as a parsonage by the officiating clergyman of a religious corporation of this State; (2) the land on which the residence sits, not in excess of five acres, must be necessary for the fair enjoyment of the premises and not devoted to a purpose other than use as a parsonage; (3) the entity claiming the exemption must not be conducted for profit, nor may the building or land associated with the parsonage be conducted for profit; (4) the entity claiming the exemption must own the property in question; and (5) the entity seeking the exemption must be authorized to carry out the purposes of a parsonage.

In applying these statutory criteria to the facts in this case, the court is mindful that because they represent a departure from the fundamental approach that all property owners bear their fair share of the local property tax burden "[t]ax exemption statutes are strictly construed, and the burden of proving entitlement to an exemption is on the party seeking it." Abunda Life Church of Body, Mind & Spirit v. City of Asbury Park, 18 N.J. Tax 483, 485 (App. Div. 1999) (citing New Jersey Carpenters Apprentice Training and Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78 (1996); Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214 (1961)). "'[A]ll doubts are resolved against those seeking the benefit of a statutory exemption . . . .'" Borough of Chester v. World Challenge, Inc., 14 N.J. Tax 20, 27 (Tax 1994) (quoting Township of Teaneck v. Lutheran Bible Inst., 20 N.J. 86, 90 (1955)). These standards, however, do "not justify distorting the language or the legislative intent" of the exemption statute. Boys' Club of Clifton, Inc. v. Township of Jefferson, 72 N.J. 389, 398 (1977). "[W]hile the construction of the applicable statute must be strict, it must also be reasonable." Phillipsburg Riverview Org. v. Town of Phillipsburg,

8

26 N.J. Tax 167, 175 (Tax 2011) (citing International School Serv., Inc. v. Township of West Windsor, 412 N.J. Super. 511, 524 (App. Div. 2010), aff'd, 207 N.J. 3 (2011)), aff'd, 27 N.J. Tax 188 (App. Div. 2013). "The rule of strict construction must not defeat the evident legislative design." Phillipsburg Riverview, 26 N.J. Tax at 175.

There is no dispute that the subject property satisfies four of the five statutory factors. The parcel is less than five acres, the land is necessary for the fair enjoyment of the premises, and is devoted only to use as a parsonage. In addition, the congregation owns the property, is a non-profit organization, and the subject property is used consistent with the organizational purpose of the congregation. The municipality's denial of an exemption is based only on the tax assessor's determination that the subject property is not occupied by an officiating clergyman of the congregation. The validity of that decision turns on the meaning of "officiating clergymen" as it appears in N.J.S.A. 54:4-3.6.

Statutory construction begins with the statute's plain language. Merin v. Maglaki, 126 N.J. 430, 434 (1992). "A statute should be interpreted in accordance with its plain meaning if it is clear and unambiguous on its face and admits of only one interpretation." Board of Educ. v. Neptune Twp. Educ. Ass'n, 144 N.J. 16, 25 (1996) (quotations omitted). "[T]he best approach to the meaning of a tax statute is to give to the words used by the Legislature their generally accepted meaning, unless another or different meaning is expressly indicated." Public Serv. Elec. & Gas Co. v. Township of Woodbridge, 73 N.J. 474, 478 (1977) (quotations omitted). "'The duty of . . . this court, is to give meaning to the wording of the statute and, where the words used are unambiguous, apply its plain meaning in the absence of a legislative intent to the contrary.'" Vassilidze v. Director, Div. of Taxation, 24 N.J. Tax 278, 291 (Tax 2008) (quoting Sutkowski v. Director, Div. of Taxation, 312 N.J. Super. 465, 475 (App. Div. 1998)).

9

On first review, the Appellate Division holding in <u>Borough of Cresskill v. Northern Valley Evangelical Free Church</u>, 125 N.J. Super. 585 (App. Div. 1973), appears to preclude the granting of a parsonage exemption where the occupant of the property is not ordained. In that case, the taxpayer challenged the denial of a parsonage exemption for a building "occupied by the youth director of the church and his wife." <u>Id.</u> at 586. It was undisputed that the youth director "was a seminary student and had not been ordained as a minister." <u>Ibid.</u> The court found in the absence of an ordination the statutory criteria for a parsonage exemption could not be satisfied:

> In our view, the youth director of a church who is not an ordained minister is not one of the "officiating clergymen" of the religious corporation which employs him, within the meaning of those terms in the context of the statute. Webster defines "clergyman" as, "a member of the clergy: an ordained minister: a man regularly authorized to preach the gospel and administer its ordinances; one in holy orders"; and "clergy" as, "the body of men and women duly ordained to the service of God in the Christian church; the body of ordained ministers: clergymen and clergywomen." <u>Webster's Third New International Dictionary</u> (1966). The property having been occupied by a person who was not a clergyman, officiating or otherwise, it is not entitled to an exemption as a parsonage.
>
> [<u>Ibid.</u>]

However, in <u>Goodwill Home and Missions, Inc. v. Borough of Garwood</u>, 281 N.J. Super. 596, 599 (App. Div. 1995), the Appellate Division, determining whether the parsonage exemption applied to a parcel, and relying on several United States Supreme Court opinions issued after <u>Cresskill</u>, cautioned:

> The guarantees of the Free Exercise Clause of the federal constitution and the religious freedom clause of our State constitution restrict inquiry into what is an organized religion, who is a member of its clergy and what constitutes a "congregation" of a religious body.
>
> [(citing <u>U.S. Const.</u> amend. I; <u>N.J. Const.</u> art. I, ¶¶ 3 and 4).]

10

Although the occupant of the parsonage in that case was ordained as a minister, the fact of his ordination was not determinative. Instead, the court examined the minister's responsibilities to determine whether

> [t]hese duties sound like those performed by congregational leaders of all religious denominations. A congregation has the right to determine how its minister performs his or her religious duties. "[T]he municipality cannot question [such a] determination." Governmental inquiry into how a minister allocates the performance of his or her religious duties is an improper incursion into the activities of a religious organization, an intrusion uncalled for by the statute and proscribed by constitutional protection.
>
> [Id. at 604 (quoting Trenton Church of Christ v. City of Trenton, 3 N.J. Tax 267, 271 (Tax 1981)).]

When concluding that the minister in that case was an officiating clergyman for purposes of the parsonage exemption, the court was not dissuaded from its conclusion by the fact that the minister was a member of a different denomination of the faith and attended services at a different congregation:

> Nor is it government's concern where [the minister] and his family attend religious services. The statute does not require that a minister and/or his family attend services at the place of worship where he or she is a spiritual leader.
>
> [Id. at 604.]

In Congregation Ahavath Torah v. City of Englewood, 21 N.J. Tax 318 (Tax 2004), Judge Pizzuto provided a cogent summary of the judicial precedents guiding the determination of whether the occupant of a parcel is an officiating clergyman for purposes of N.J.S.A. 54:4-3.6. In that matter, a parsonage exemption was sought for property owned by a Jewish congregation and occupied by its cantor. The cantor "perform[ed] a variety of services for the congregation, including: directing of liturgical prayer; conducting various prayer services; assisting in the conduct of daily services; participating in weddings and funerals; and reading or chanting from

11

sacred texts for holidays." Id. at 319. It was also undisputed that "while some lay members of certain congregations may have the knowledge to lead a service (in the role of cantor), in this congregation lay members are not permitted to perform a duty or responsibility of the cantor without the cantor's consent." Id. at 319-320.

The court explained that

> [i]n determining whether a given person qualifies under the Parsonage Exemption, the cases look to the character and extent of activities within the religious organization. Friends of Ahi Ezer Congregation, Inc. v. City of Long Branch, 16 N.J. Tax 591 (Tax 1997); Shrine of Our Lady of Fatima [v. Township of Mantua], 12 N.J. Tax 392 ([Tax] 1992). The decisions have examined a variety of factors to determine whether a particular individual is an officiant within the meaning of the Parsonage Exemption, and it is clear that it is not status or title, but the services performed that determine if the exemption will apply. The Appellate Division, in St. Matthew's Lutheran Church for the Deaf v. Division of Tax Appeals, 18 N.J. Super. 552 (App. Div. 1952), explained that the Parsonage Exemption requires:

>> Something . . . more or less permanent, both as to character of the pastor and nature of the persons served by him, must have been intended as the necessary qualifications. Consequently, an "officiating clergyman" when textually associated with "parsonage" must be a settled or incumbent pastor or minister, that is, a pastor installed over a parish, church or congregation. And when he is an "officiating clergyman of any religious corporation" he must be serving the needs of a reasonably localized and established congregation.

> [Id. at 320 (citations omitted).]

In addition,

> [l]ater cases have followed the practice of examining the role of the person in question within the congregation to determine whether the Parsonage Exemption should apply. "If the duties sound like those performed by congregational leaders of all religious denominations, the clergyman is considered an officiating clergyman of the religious corporation." City of Long Branch v. Ohel Yaacob

12

Congregation, 20 N.J. Tax 511, 517 (Tax 2003), aff'd, 21 N.J. Tax 268 (App. Div. 2003) (quoting Friends of Ahi Ezer, 16 N.J. Tax 595).

[Id. at 321.]

Moreover, given the statutory provision allowing up to two parsonages for a congregation, the statute "certainly contemplates that two persons may each function, either simultaneously or at different times, as officiating clergy" for the same congregation. Id. at 321 (citing Goodwill Home, 281 N.J. Super. at 598 n.1). In addition the statute "may with equal reason be read to contemplate two separate roles within the concept of officiating clergy." Ahavath Torah, 21 N.J. Tax at 321.

In Ahavath Torah, the court held that the parsonage exemption was satisfied because the cantor:

> has a permanent position that includes, among other duties, the conduct of religious services at the congregation's synagogue on a regular, even daily, basis. Given the cantor's importance in the congregation's worship services, his role at weddings and funerals, and his general level of intimate participation in congregational life, the exemption should not be denied on the basis of a categorical restriction of its availability, in the case of Jewish congregations, to rabbis. Instead, as with other members of the clergy, the character and extent of an individual's activities within the congregation will determine if the Parsonage Exemption applies.
>
> [Id. at 323.]

Shortly thereafter, in Temple Emanu-El v. City of Englewood, 21 N.J. Tax 462 (Tax 2004), Judge Pizzuto considered whether a retired rabbi satisfied the statutory definition of officiating clergyman for the parsonage exemption. When setting forth his understanding of the controlling legal precedents, the judge explained

> [t]his analysis should not be understood to restrict the applicability of the term "officiating clergyman" to the individual having ultimate supervision of the affairs of the congregation or responsibility to conduct regularly scheduled worship services. A restriction of this kind would not compart with the legislative allowance of separate

13

parsonage exemptions for two individuals with different roles in the same congregation. Where the activities are those performed by members of the clergy and where the individual is engaged in a continuing and regular pattern of activities, as opposed to one that is sporadic or occasional, the individual may be considered an officiating clergyman, even where the role does not include ultimate supervision of congregational affairs or the conduct of regularly scheduled services. In any given case, the question is fact-sensitive and the test is the character and extent of the activities actually performed.

[Id. at 467-68.]

Here, it is undisputed that Mr. Sparks is not an ordained minister. He did not attend seminary and has no specific religious training outside of his study of sacred music, and his familiarity with scripture as a member of a Christian church. Like the cantor in Ahavath Torah, however, Mr. Sparks plays an important role in services at the congregation. He uses his training and experience, including his familiarity with scripture, to select and perform music that complements the religious messages delivered by the Minister of Word and Sacrament each week. He trains members of the congregation to sing at weekly services. Reverend Cherry credibly testified hymns have symbolic religious meaning and the act of communal singing is a recognized component of worship in the Reformed Church with a long historic pedigree. In addition, Mr. Sparks is an integral part of weddings and funerals at the congregation, providing the musical elements of celebration and mourning, respectively. Mr. Sparks is involved in the life of the congregation, he is a permanent employee of the congregation, who resides adjacent to the church building, and plays an active role in weekly religious services, and during important milestones in the lives of congregants. He trains the children of the congregation in the musical aspects of worship during summer vacation bible camp.

Importantly, both Reverend Cherry and Mr. Sparks credibly testified that they viewed the Minister of Music to play a significant part in religious life at the congregation. The views

14

appeared sincerely held. Where adherents to a faith have a sincerely held belief that a person is a leader in providing worship services to a congregation, and that belief is corroborated by objective evidence of that person's training, experience, and responsibilities, the courts should hesitate to discount those beliefs because of the absence of an act, such as ordination, the court believes is necessary to impart the status of clergyman. It is not for the judiciary to impose on a religious congregation its view of who is or is not a clergyman in that congregation. The court's only role is to determine whether the legislative objectives expressed in the exemption statute have been met. The record in this case establishes that Mr. Sparks plays a sufficiently important and recognized role in the religious life of the congregation to satisfy the exemption statute's requirement that he be an officiating clergyman.

The court will enter Judgment awarding an exemption for the subject property as a parsonage pursuant to N.J.S.A. 54:4-3.6 for tax year 2016. In light of this conclusion, it is not necessary to determine whether the parcel also meets the statutory qualifications for the separate religious use exemption pursuant to N.J.S.A. 54:4-3.6.[3]

---

[3] The municipality's challenge to the amount of the assessment on the subject property for tax year 2016, asserted in the Counterclaim, remains pending.